**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 1:07-cv-00333-ESH ) |
| THE HONORABLE CARLOS M. GUTIERREZ, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

**MOVANT MAINE LOBSTERMEN'S ASSOCIATION**
**MOTION TO INTERVENE IN THIS ACTION**

Pursuant to Fed. R. Civ. P. 24 and for the reasons set forth in its accompanying Memorandum of Points and Authorities, Movant, Maine Lobstermen's Association ("MLA") respectfully submits this Motion to Intervene as of Right, in or, in the alternative, for Permissive Intervention the above-captioned action under Fed. R. Civ. P. 24(a)(2), (b)(2). As set forth in more detail in the attached Memorandum of Points and Authorities, including the supporting declaration, MLA is an association, whose participants include approximately one thousand two hundred commercial lobstermen, which seeks to intervene in this litigation in order to protect its interests and those of its participants who rely upon the revenue generated from commercial lobster fishing activities.

Pursuant to Local Rule 7(m), counsel for MLA has conferred with counsel for Plaintiff and Defendants in this action. Defendants' counsel has no objection to MLA's Motion to Intervene, while Plaintiff's counsel states: "are unable to take a position at this time but reserve the right to object after having an opportunity to review the documents supporting the motion."

For the foregoing reasons, MLA respectfully requests that its Motion to Intervene be granted.

Dated: April 16, 2007                          Respectfully submitted,

David E. Frulla  (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
Andrew Minkiewicz (MA Bar No. 651209)
KELLEY DRYE & WARREN, LLP
3050 K Street, NW – Suite 400
Washington, DC  20007
Telephone:  (202) 342-8400
Facsimile: (202) 342-8451

Attorneys for Movant, Maine Lobstermen's Association

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE HONORABLE<br>  CARLOS M. GUTIERREZ, *et al.* )<br><br>Defendants. ) | Civ. No. 1:07-cv-00333-ESH |

<u>**[PROPOSED] ORDER**</u>

Movant Maine Lobstermen's Association has filed a motion for intervention in this action. Based upon Movant's submission, it is hereby ORDERED this ___ day of _____, 2007, that the Motion for Intervention is GRANTED.

Dated: _____

_____
Hon. Ellen S. Huvelle
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 1:07-cv-00333-ESH ) |
| THE HONORABLE CARLOS M. GUTIERREZ, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOVANT MAINE LOBSTERMEN'S ASSOCIATION'S MOTION TO INTERVENE IN THIS ACTION

### I.    INTRODUCTION

Movant, the Maine Lobstermen's Association ("MLA") respectfully submits this Memorandum of Points and Authorities in support of its Motion to Intervene as of right under Fed. R. Civ. P. 24(a)(2) or, in the alternative, permissively under Fed. R. Civ. P. 24(b).

MLA was founded in 1954. Its participants include approximately 1,200 full-time lobstermen from the entire coast of Maine. (*See* Declaration of Patrice McCarron (hereafter, "McCarron Decl."), ¶ 5) (attached hereto as Exhibit 1). The Maine lobstering industry is the backbone of Maine's coastal communities generating a billion dollars annually in economic activity. (*See id.* ¶ 7.) The American lobster resource on which MLA's members rely is healthy and sustainably fished. (*Id.* ¶ 8.) Maine only allows lobstermen to catch and land lobsters using traps (a.k.a., pots), which are limited in overall amount and to each fishermen in order to insure that the resource is both monitored and not overharvested. (*Id.* ¶¶ 8, 10, 32.)

MLA's interest in this case involves the potential imposition of new regulatory requirements on their fishing gear, in particular, the ropes that connect a string lobster, or "groundlines." (*Id.* ¶ 1.) "The [MLA] and its members have been working hard to find alternatives to this requirement, which is economically damaging, presents safety hazards, and represents a 'solution' to a 'problem' not borne out by available scientific information." (*Id.*)

More specifically, anywhere from two to twenty-five lobster traps are strung together with groundlines. (*Id.* ¶ 9.) Typically, groundlines have been made of durable, reasonably-priced, and buoyant polypropylene rope that floats an average of ten feet off the sea floor in order to prevent the rope from abrading on the rocky sea floor or becoming ensnared in rock outcroppings. (*Id.*) Left to "soak" for no more than two weeks, lobstermen map the location of their traps and attach, at either one or both ends of the string of pots, a line with a floating buoy that identifies the owner. (*Id.* ) After the appropriate soak period, fishermen return to their traps and pull them up, using the buoy line, which is run through a hydraulically-operated winch generally located amidship or towards the middle of the vessel, while the operator or his crew member stands by to bring the traps aboard, empty the lobsters and rebait the pots. (*Id.*)

Recognizing the depleted nature of the North Atlantic whale stocks, and the importance of protecting each one, the MLA and National Marine Fisheries Service ("NMFS") have taken several voluntary and regulatory steps over the years to minimize the potential for harm, because the gear used in the lobster fishery and in other similar trap fisheries (such as that for red crab and certain fish species), specifically the buoy line, has been known to have interactions with large whales. (*Id.* ¶ 12.) For instance, beginning in 2003, lobstermen have been required to use buoy line with "weak links," or links in the rope designed to break away under forces caused by an interaction with a large whale. *See* 68 Fed. Reg. 51195, 51195 (Aug. 26, 2003). NMFS has

**Memorandum Supporting MLA's Motion to Intervene - Page 2**

also instituted what is known as "dynamic area management" ("DAM") under which large zones

in the ocean can be quickly designated as a special management area after a concentration of

right whales is sighted in the vicinity, and all lobster traps fished in the area must the equipped

with special "whale safe" gear. (*See, e.g., id.* at 51195-96.)

    As part of this regulatory protection scheme, NMFS formed the Atlantic Large Whale

Take Reduction Team ("ALWTRT") under the authority of the Marine Mammal Protection Act.

The ALWTRT is comprised of scientists, environmentalists, industry participants and others.  It

is designed to recommend and discuss measures to help reduce "takes"[1] of large whales.  61 Fed.

Reg. 40819, 40819-21 (Aug. 6, 1996).  The ALWTRT is a consensus-based organization, which

strives to provide recommendations that enjoy unanimous support.  (McCarron Decl. ¶ 14.)

Through the ALWTRT, the MLA has sought to enhance the information and techniques used by

the Defendants to protect large whales, while sustainably harvesting the lobster resource, and

maintaining lobstermen's traditions and way of life.  (*Id.* ¶¶ 11, 13-14, 16-19.)  In this regard,

MLA also collaborates with members of the technical and scientific community, including

privately funded and government scientists.  (*Id.* ¶¶ 36-47.)  The scientific and technical work in

which MLA participants have assisted includes matters relating to reduction of interactions

between whales and lobster fishing gear.  (*Id.*)  The MLA and its members have  also undertaken

voluntary conservation efforts, including participating in scientific studies on the behavior of

whales and lobster gear and testing experimental lines and lobster gear for its feasibility and

effectiveness in conserving whales.  (*See, e.g., id.* ¶¶ 25, 35-36.)

---

[1]    Under the MMPA, a "take" is defined as "to harass, hunt capture or kill, or attempt to
harass, hunt capture or kill, any marine mammal ."  16 U.S.C. § 1362(13).  A take is any such
interaction with a marine mammal, whether or not it results in injury or death.

**Memorandum Supporting MLA's Motion to Intervene - Page 3**

The Humane Society and the Ocean Conservancy ("Plaintiffs") have brought this complaint to compel the National Marine Fisheries Service's ("NMFS") compliance with a statutory deadline within the Marine Mammal Protection Act ("MMPA"). 16 U.S.C. §§ 1362-1421h.  In essence, Plaintiffs are asking this Court to compel NMFS to issue a rule with significant, unresolved issues.

The relief Plaintiffs seek could have very negative – actually bankrupting – effects on the Maine lobster industry because it could end up requiring the Federal Defendant to issue regulations, which will likely have an extremely high economic impact on MLA's members and offer very little if any protection for Atlantic large whales.  (McCarron Decl. ¶¶ 29-34.)  In addition, such relief, in the likelihood it leads to overly stringent regulations, would not provide a way for the Maine lobstermen to prosecute their fishery in a safe and economical fashion. (*Id.* ¶¶ 29-32.)  Any prohibition on floating groundline, as included in the proposed rule the Plaintiffs wish to compel, represents an extreme safety risk to lobstermen fishing over rocky bottom and the potential loss of gear represents large economic losses.  (*Id.* ¶¶ 29-33.)  MLA seeks to intervene in this action to protect its participants' demonstrated interests in the continued economic viability and safety of their lobster fishing operations, in a science-based marine mammal protection regime, and to protect their interests in the full-time lobster permits they have been issued by NMFS and the State of Maine.

## II.    FACTS

### A.    Proposed Regulatory Regime

On June 21, 2005, the Secretary of Commerce, acting through his designees at the National Oceanic and Atmospheric Administration ("NOAA") and NMFS (collectively, "Defendants"), issued a proposed rule to implement the Atlantic Large Whale Take Reduction

**Memorandum Supporting MLA's Motion to Intervene - Page 4**

Plan ("ALWTRP"). *See* 70 Fed. Reg. 35894 (June 21, 2005) (proposing regulations implementing ALWTRP). After receiving public comment from the MLA and other interested stakeholders, NMFS is working to develop a final rule. Upon information and belief, the final rule was submitted for inter-agency review, but was then withdrawn. Plaintiffs are now seeking to compel the issuance of that rule, which is not ripe for implementation.

Pursuant to the proposed rule, the use of floating groundline in the lobster trap fishery would be banned except for some small exemption areas within coastal inlets and bays. (McCarron Decl. ¶ 27.) Defendants proposed the regulations banning the use of floating ground line knowing the ban would have a severe economic impact on the lobster fishery. *See* NMFS, Draft Environmental Impact Statement for Amending the ALWTRP: Broad-Based Gear Modifications, Chapter 6 (Feb. 2005), *available at* http://www.nero.noaa.gov/nero/hotnews/whales/ (last visited April 12, 2007). The Maine lobster industry realized the proposed rule would impose major, recurring, unaffordable, and even bankruptcy costs on its participants. (McCarron Decl. ¶¶ 29-32.)

The MLA is gravely concerned about the elimination of floating groundline because it is necessary to fish for lobsters on rocky bottom that is exposed to extreme tides and current as is found along most of the coast of Maine. (*Id.* ¶¶ 29-30.) Sinking ground line becomes lodged amongst the rocks and chafes on the jagged rocks wearing out within a season or two. (*Id.* ¶ 30.) Floating line rises up in the water column above the rocks, rarely catching on the rocks and does not chafe nearly as fast as sinking line, and lasts between seven and nine seasons. (*Id.* ¶ 29.) When sinking line becomes caught on rocks or "hung down," it can lead to the loss of the trap and, moreover, can either capsize the lobster boat or seriously injure the lobsterman. (*Id.* at ¶¶ 30-31, 33.)

**Memorandum Supporting MLA's Motion to Intervene - Page 5**

The Defendants' proposed rule is intended to reduce the occurrence of entanglements of large whales in fishing gear; however, to MLA's knowledge the Defendants have no documentation of an instance large whale becoming entangled in a Maine Lobstermen's groundline. (*Id.* at ¶ 28.) In fact, the entanglement and subsequent death of right whale # 3107 that precipitated this new round of regulations was clearly the result of an end line with a buoy attached to it and not a ground line, and the whale was seen entangled hundreds of miles away from the Maine lobstering grounds. (*See* Compl. ¶ 31.) MLA has consistently pointed out the lack of correlation between the problem the Plaintiffs are seeking to correct and the Defendants' proposed solution. (*See, e.g.,* McCarron Decl. ¶ 28.)

**B.    MLA's Interest**

This is the first time the MLA has sought to intervene in an action brought by the Plaintiffs. MLA's approximately twelve hundred participants have full-time permits issued by Defendants and the State of Maine to fish for lobsters in the Gulf of Maine. (*Id.* ¶ 5.) The proposed NMFS regulations, if compelled by the Court, have the potential to directly impact lobstermen's prosecution of their fishery and thus their livelihood. (*Id.* ¶¶ 29-32.) As explained above, MLA was formed in 1954, and engages on issues related to policy, research, conservation and education. (*Id.* ¶¶ 4-6.) The MLA organized itself to protect the lobstermen's way of life and advocate for a sustainable and responsible fishery. (*Id.* ¶¶ 4, 7.)

Accordingly, from the very inception of the ALWTRT, the MLA and its participants have worked with federal and state authorities and representatives from non-governmental organizations to obtain authorization for and to develop and implement techniques to collect information on large whale interactions with lobster fishing gear and create technological solutions. (*Id.* ¶¶ 11-21.)

**Memorandum Supporting MLA's Motion to Intervene - Page 6**

The MLA also has worked diligently to formulate new concrete measures that work for the whales and the fishermen. The MLA has prepared and tested numerous concepts to reduce interactions between whales and lobster gear and minimize the risk of entanglement. (*Id.* ¶¶ 35-46.) As befits the importance of these matters to MLA and its participants, MLA believes that it has participated in virtually every public meeting convened by federal fisheries managers involved in the development of proposed rules stemming from the ALWTRT process. (*Id.* ¶ 13.) For these reasons, MLA has as particular interest in rules promulgated following NMFS ALWTRP regulatory processes.

**C.    The Instant Action Will Harm Movant's Interests**

Plaintiffs allege that they filed the above-captioned case in order to compel the Defendant to issue a rule implementing new regulations on lobster gear. Plaintiffs do not, however, explain what should happen to lobster management should the Court order NMFS to issue a regulation. Absent additional rulemaking, the alternative appears to be an extremely problematic proposed rule that has not cleared federal review processes, does not represent a consensus view of the members of the ALWTRT, and would impose an unworkable ban on floating groundline. If this happens, it would represent the very situation that the organization has been dedicated to preventing, to wit, a universal requirement to fish lobster gear with sinking groundlines that will have drastic economic and safety implications for the Maine lobster industry. (*Id.* ¶¶ 29-33.) Consequently, it is imperative that MLA be allowed to intervene in this action to assert and protect its participants' interests.

**III.    ARGUMENT**

**A.    MLA Has Satisfied The Standards For Intervention Of Right**

The rule, if implemented prematurely in its current form, threatens to bankrupt the Maine lobstermen's fishing industry. This Court should allow MLA to intervene as a matter of right to preserve its members' interests, which are not being adequately represented by the current litigants.

Fed. R. Civ. P. 24(a)(2) governs intervention "as of right." It states in pertinent part:

> (a)  Upon timely application, anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

An applicant seeking intervention of right under Rule 24(a)(2) must meet four requirements: (1) the motion must be timely; (2) the applicant must claim an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant must show lack of adequate representation." *See Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (quoting Fed. R. Civ. Pro. 24(a)); *see also Williams & Humbert, Ltd. v. W. & H. Trade Marks, Ltd.*, 840 F.2d 72, 74 (D.C. Cir. 1988)); *Nuesse v. Camp*, 385 F.2d 694, 699 (D.C. Cir. 1967); *People for the Ethical Treatment of Animals (PETA) v. Babbitt*, 151 F.R.D. 6, 7 (D.D.C. 1993).

In addition, in this Circuit an applicant for intervention as of right must demonstrate standing (injury-in-fact, causation, and redressability). *See Environmental Defense v. Leavitt*, 329 F. Supp. 2d 55, 66 (D.D.C. 2004). Specifically, the applicant must have suffered a harm (injury) that is concrete and actual or imminent, not conjectural or hypothetical; the injury must be fairly traceable to the alleged governmental conduct; and it must be likely that the requested relief will redress the alleged injury. *Id.* (citations omitted)  Importantly, "any person who

satisfies Rule 24(a) will also meet Article III's standing requirement." *Id.* (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003)).

"The D.C. Circuit has taken a liberal approach to intervention." *The Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000) (citing *NRDC v. Costle*, 561 F.2d 904, 910-911 (D.C. Cir. 1977)). Indeed, the D.C. Circuit has emphasized that the standards for intervention must be interpreted flexibly (*i.e.*, "require other than literal application") in resolving applications to intervene filed in actions seeking judicial review of administrative action. *See Nuesse*, 385 F.2d at 178-79.

### 1.    MLA's Application Is Timely

Timeliness is measured from when the prospective intervenor "knew or should have known that any of its rights would be directed affected by the litigation." *Roeder*, 333 F.3d at 233 (citing *Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 433-4 (D.C. Cir. 1989)). Timeliness "is to be determined from all the circumstances" surrounding the case. *Natural Resources Defense Council, Inc. v. Costle*, 561 F.2d at 907. To this end, the D.C. Circuit has stated:

> While timeliness is a prerequisite to any claim for intervention under Rule 24, it is settled -- particularly where intervention is sought as of right -- that the amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. Rather, the court should also look to the related circumstances, including the purpose for which the intervention is sought, the necessity for intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already parties in the case.

*Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) (citations omitted); *see also NRDC v. Costle*, 561 F.2d at 907; *PETA*, 151 F.R.D. at 7 (*citing United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C.Cir. 1980)).

Plaintiffs filed the complaint on February 12, 2007. The Defendants have not yet filed a response to the Plaintiffs' complaint. The case is in a preliminary stage and the inclusion of the MLA at this time will not prejudice either party.

**Memorandum Supporting MLA's Motion to Intervene - Page 9**

Accordingly, granting MLA's motion to intervene is timely and will not prejudice any of the current parties to this litigation. *See Natural Resources Defense Council, Inc.*, 561 F.2d 904, 907 (D.C.Cir. 1977) (holding that motion to intervene is timely in light of purpose of motion and lack of prejudice to parties).

## 2.    MLA Has A Direct And Substantial, Legally Protectable Interest In The Subject Matter Of This Action

To meet the second prong — the cognizable interest test— the applicant must show that it has a "legally protectable" interest related to the subject of the litigation. *See Mova Pharmaceutical*, 140 F.3d at 1074 (*quoting Southern Christian Leadership Conf. v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984)). This test is not stringent: "In a motion to intervene under Rule 24(a)(2), the question is not whether the applicable law assigns the prospective intervenor a cause of action . . . . As the Rule's plain text indicates, intervenors of right need only an 'interest' in the litigation — not a 'cause of action' or 'permission to sue.'" *Jones v. Prince Goerge's County, Maryland*, 348 F.3d 1014, 1017-8 (D.C. Cir. 2003).

Typically, "those who use the land [here, the ocean] in question and allege injury to aesthetic, conservational, and recreational, as well as economic values have legally protectable interests." *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972). Ownership of a permit affecting the resource at issue, *a fortiori*, constitutes a protectable interest. *see Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993) (finding the City of Phoenix, because it held discharge permits, had a legally protectable interest related to the subject of the litigation under the Clean Water Act).

Other Circuits have permitted industry participants to intervene as a matter of right in cases similar to the one at bar brought by environmental groups seeking more extensive regulation by public agencies. Most significantly, in *CLF v. Mosbacher*, 966 F.2d 39 (1st Cir.

**Memorandum Supporting MLA's Motion to Intervene - Page 10**

1992), the First Circuit reversed the district court's decision denying the intervention of various commercial fishermen's associations' in the environmental groups' lawsuit requesting stricter controls on the Northeast Atlantic groundfish fishery. 966 F.2d at 45. The applicants in that case sought to intervene in order to participate in the implementation of a consent decree that would set a timetable for the development of a plan to eliminate the over-fished condition of the fishery. *Id.* at 41. The First Circuit found the fishermen's associations had a legally protectable interest because their members' "economic interests [would] be substantially affected" by the implementation of the consent decree. "The consent decree requires action by the Secretary that will change the [current] situation – a development that the fishing groups do not favor." *Id.* at 43. In finding a legally protectable interest, the court reasoned that "[t]he fishing groups seeking intervention are the real targets of the suit and are the subjects of the regulatory plan. Changes in the rule will affect the proposed intervenors' business, both immediately and in the future." *Id. See also Kleissler v. United States Forest Service*, 157 F.3d 964 (3rd Cir. 1998) (permitting industry and community groups with a financial stake in National Forest logging operations to intervene as of right in suit by environmental group to enjoin logging activity pending compliance with the National Environmental Policy Act); *Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir. 1996) (permitting trade association representing farmers to intervene as of right in a suit to restrict pumping of water from an aquifer for, among other things, these farmers' use); *Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) (permitting timber purchasers to intervene in action challenging U.S. Forest Service logging regulations).

On multiple occasions, the D.C. Circuit, and this Court, have found industry groups to have a sufficient interest to intervene in litigation brought by environmental groups against government agencies challenging regulatory decisions. *See Conservation Law Foundation,*

*supra; NRDC v. Costle,* 561 F.2d at 913; *The Wilderness Society v. Babbitt,* 104 F. Supp. at 18;

*Huron Environmental Activist League v. EPA,* 917 F. Supp. 34, 42 (D.D.C.1996); *NRDC v. EPA,*

99 F.R.D. 607 (D.D.C. 1983). This Court has also permitted members of the New England

groundfish fishing industry to intervene to help craft a remedy in New England groundfish-

related litigation. *See Conservation Law Foundation v. Evans,* 211 F. Supp.2d 55 (D.D.C.

2002).

In *NRDC v. EPA,* this Court held that intervenors (industry groups representing pesticide

manufacturers) had a "substantial and direct interest in the subject of th[e] litigation" where

EPA's preliminary decisions regarding product registration would be set aside if plaintiffs

succeeded in the case. *See* 99 F.R.D. at 609. Similarly, in *Huron Environmental Activist League,*

this Court held that an industry group representing the cement industry had demonstrated a

sufficient interest to intervene as of right, where the relief the plaintiffs sought "would have the

result of rendering useless . . . the substantial good faith efforts of the . . . industry" in working

with the government to seeks solutions to environmental and regulatory problems. 917 F. Supp.

at 42.

Here, MLA members have a legitimate, legally protectable interest in the proposed

regulation which is the subject of this litigation. MLA's members have been issued permits to

conduct full-time fishing for lobsters in state and federal waters.[2] The lobster permits allow

MLA's members to use the ocean in question, and they depend on these lobster permits for

economic survival. Courts have found similar uses to constitute legally protectable interests.

---

[2]    MLA has associational standing to assert its members' interests. MLA's members
involved in the lobster fishing industry have sufficient interests to intervene individually in this
action seeking judicial compulsion of a rule that will substantially affect their ability to prosecute
the fishery. Moreover, the interest of its members that MLA is seeking to protect are germane to
MLA's purposes. (*See* McCarron Decl., ¶¶ 4-7); *Hunt v. Washington State Apple Advertising
Comm'n,* 432 U.S. 333, 343 (1977); *Sierra Club v. Glickman,* 82 F.2d at 110.

*See Sierra Club v. Norton, supra; Sierra Club v. EPA, supra.* MLA's legally protectable interest in federal and state issued lobster permits is directly, and substantially, related to the subject matter of this lawsuit—a regulation that if implemented in its current form would significantly reduce, if not eliminate, the MLA members' ability to fish for lobster. If Plaintiffs succeed, the very nature of the proposed regulation will change the current lobster fishing situation in an unfavorable, perhaps intractable, way for the MLA members. In fact, because the proposed rule prohibits floating groundline, the only currently economically viable means of fishing for lobster off most of the coast of Maine, its implementation could effectively put MLA members out of business. As such, the MLA members are the real targets of the suit and the subjects of the regulatory plan. *See Mosbacher, supra.* They face imminent, and concrete economic injury, in terms of lost fishing opportunities and revenue, as well as economic and conservation costs in terms of lost lobster yield.

Moreover, the MLA has acted well in advance of any judicial review of the proposed ALWTRP regulations. Because its members have such a heavily vested interest in lobster gear and whale take regulation, MLA has participated in the ALWTRT since its inception. It has continually sought a sensible solution that would protect the whales, while allowing the Maine lobstering industry to go forward. MLA now seeks to protect its interests in this vital stage of litigation. MLA has demonstrated that it has a legally protectable interest directly, and substantially, related to the proposed regulation at issue in this lawsuit.

      **3.**     **This Case's Disposition Without Movant's Participation Would, As A Practical Matter, Impair And Impede Movant's And Its Members Ability To Protect Their Interests**

Whether disposition of the action may, as a practical matter, impair or impede an applicant's ability to protect its interests focuses on the "practical consequences" of denying

**Memorandum Supporting MLA's Motion to Intervene - Page 13**

intervention. *See NRDC v. Castle*, 561 F.2d at 909. In *CLF v. Mosbacher*, the First Circuit, held

that the practical consequences of denying commercial fishing organizations the opportunity to

intervene was that the fishing organizations' economic interest will be substantially affected

should plaintiffs prevail. *See* 966 F.2d at 43 (citing numerous analogous cases in which industry

groups were allowed to intervene to protect their interests). This was enough for the First Circuit

to find the commercial fishing organizations interests to have been impaired. In coming to this

conclusion, the court relied on the fishing organizations representations that "from their

viewpoint, [they] would be best served if they were able to stop the [proposed rule] before it gets

underway." *Id*. at 44.

        This Court has found on more than one occasion that industry groups could not

effectively protect their interests unless they were permitted to intervene in actions filed by

environmental groups challenging regulatory decisions by government agencies, because the

disposition of the action may impair or impede the industry groups' ability to protect their

interests. *See Huron Environmental Activist League,* 917 F. Supp. at 42. *NRDC v. EPA*, 99

F.R.D. at 609.

        Movants should not be denied the opportunity to intervene in this case, simply on the

grounds that they will have the opportunity to challenge the regulatory actions that are ultimately

adopted. As the D.C. Circuit has stated, Rule 24(a)(2) requires an examination of the "'practical

consequences'" of denying intervention, "even where the possibility of future challenge to the

regulation remained available." *NRDC v. Castle*, 561 F.2d at 909 (*quoting Nuesse*, 385 F.2d at

702). Of particular concern to the D.C. Circuit in *Castle* was that delaying judicial review until

after promulgation potentially subjects appellants to compliance and enforcement prior to

**Memorandum Supporting MLA's Motion to Intervene - Page 14**

judicial review, affording much less protection than if allowed to participate prior to promulgation. *Id.*

Like the fishing organizations in *Mosbacher*, MLA has demonstrated that the practical consequence of the underlying litigation is substantial economic impairment to the lobster fishing industry. MLA has an even stronger case that its members' interests will be impaired than the appellants in *CLF v. Mosbacher*, whose intervention was granted at the beginning of a process that would eventually implement potentially deleterious regulations. Here, if the proposed rule is implemented as a result of a court order or other resolution of this action, MLA's members will be subject to compliance burdens and enforcement, and their businesses will suffer, if not die. At that point, it is too late for MLA to effectively assert its interests. The only means by which MLA can adequately protect its interests is to intervene now. As such, MLA is so situated that denying intervention will impair and impede, at a critical stage, its members' ability to protect their interests in the underlying litigation.

**4.    Defendants Do Not And Perhaps Institutionally Cannot Adequately Represent The Interests Of MLA's Members**

Defendants will not adequately represent the interests of the MLA and its participants in this case. The final intervention prong concerns the adequacy of representation by existing parties to the litigation. This burden of demonstrating inadequate representation is "minimal" and prospective intervenors need only show "that representation of their interests by existing parties **may be** inadequate," *see NRDC v. EPA*, 99 F.R.D. at 610 (emphasis added) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)), "not that the representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (citations omitted).

**Memorandum Supporting MLA's Motion to Intervene - Page 15**

As the D.C. Circuit has recognized, there is a "relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances." *Dimond*, 792 F.2d at 192 *(citing NRDC v. Costle, supra*, 561 F.2d at 912 n.41); *Neusse, supra*, 385 F.2d at 702-04.  Indeed, the D.C. Circuit has explained precisely how an agency and those whom it regulates have different interests that require independent representation, even if the regulated community supported regulations.  *NRDC v. Costle*, 561 F.2d at 912; *see also Dimond,* 792 F.2d at 192-93 (governmental entity charged by law with representing the public interests of its citizens might not fulfill its responsibility were it to advance the narrower interest of one element of the regulated community); *Natural Resources Defense Council, Inc.*, 99 F.R.D. at 610 (concluding that the EPA, whose policies and procedures were being challenged, may not have the same interest as the intervening industry group in demonstrating that the EPA's decisions were lawful).

In fact, the Tenth Circuit has gone so far as to observe that an agency seeking to protect both the public interest and the interest of a private intervenor undertakes a "task which is on its face impossible." *National Farm Lines v. Interstate Commerce Commission*, 564 F.2d 381, 384 (10th Cir. 1977).  Further, given the minimal nature of the showing that must be made, at least one court has held that "[t]he burden of persuasion that representation is adequate appears to rest on the party **opposing** intervention." *Caterino v. Barry*, 922 F.2d 37, 42 n.4 (1st Cir. 1990) (emphasis in original).

As explained above, the First Circuit in *CLF v. Mosbacher* ably explained why the very Defendants named in this action could not adequately represent the interests of the commercial fishing community in another action by environmental organizations seeking to compel a rulemaking to require increased restrictions on the fishing operations of the commercial

**Memorandum Supporting MLA's Motion to Intervene - Page 16**

fishermen that sought to intervene. 966 F.2d at 44-45. *See also Kleissler*, 157 F.3d at 972 (and cases cited therein). As such, MLA seeks to intervene to ensure their interests are adequately protected at this crucial stage in the litigation.

**B.      In The Alternative, Movants Satisfy The Requirements For Permissive Intervention**

Rule 24(b)(2) grants the Court discretion to allow permissive intervention upon timely application "when an applicant's claim or defense and the main action have a question of law or fact in common." In deciding whether to allow permissive intervention, a court should consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*

For the reasons outlined above, MLA's intervention motion is timely and intervention will not unduly prejudice the adjudication of the rights of plaintiff or the federal defendant. Furthermore, MLA's arguments arise out of the same facts as Plaintiff's motion and raise the same issues as are framed in that motion. Thus, should this Court find that MLA is not entitled to intervene in this action as a matter of right, it should exercise its discretion and allow permissive intervention. *See Natural Resources Defense Council, Inc. v. Tennessee Valley Authority*, 340 F. Supp. 400, 408-409 (S.D.N.Y. 1971), *rev'd on other grounds,* 455 F.2d 255 (2d Cir. 1972) (granting permissive intervention to National Audubon Society where there were common questions of law and fact with the main action and Audubon demonstrated an interest in the underlying subject matter).

**Memorandum Supporting MLA's Motion to Intervene - Page 17**

## IV.    **CONCLUSION**

For each of the foregoing reasons, MLA respectfully requests that this Court issue an

order granting its Motion to Intervene as a defendant.

Dated:  April 16, 2007                          Respectfully submitted,


                                                David E. Frulla  (D.C. Bar No. 414170)
                                                Shaun M. Gehan (D.C. Bar No. 483720)
                                                Andrew E. Minkiewicz (MA Bar No. 651209)
                                                KELLEY DRYE & WARREN, LLP
                                                3050 K Street, N.W. – Suite 400
                                                Washington, D.C.  20007
                                                Telephone:  (202) 342-8400
                                                Facsimile:  (202) 342-8451

                                                Attorneys for Movant, Maine Lobstermen's
                                                Association

# EXHIBIT 1:

# Declaration of Patrice F. McCarron

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, THE OCEAN CONSERVANCY | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:07-cv-00333-ESH ) |
| CARLOS M. GUTIERREZ, SECRETARY OF COMMERCE, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF PATRICE F. McCARRON

I, Patrice F. McCarron, declare and state as follows:

1.  I make this declaration based on my personal knowledge and in support of the Maine Lobstermen's Association's Motion to Intervene in the above captioned action. In particular, I have personal knowledge of, and have worked closely on, issues relating to the National Marine Fisheries Service's proposed requirement for non-buoyant or sinking lines that connect a string of lobster pots. These lines are called groundlines. The Maine Lobstermen's Association, Inc. ("MLA") and its members have been working hard to find alternatives to this requirement, which is economically damaging, presents safety hazards, and represents a "solution" to a "problem" not borne out by available scientific information.

2.  I am the executive director of and provide staff services to MLA. I was hired as associate director in 2000 and promoted to executive director in 2001. I work closely with MLA's Board of Directors and serve as the organization's primary spokesperson.

3.  In my role as executive director, I organize meetings of the directors and the membership, arrange for guest speakers, and report meeting summaries in the MLA's monthly newsletter. In my staff services role, I attend meetings of the Atlantic Large Whale Take Reduction Team, the Atlantic States Marine Fisheries Commission Area 1 Lobster Conservation Management Team, Maine's Lobster Advisory Council, Maine Zone Council meetings, Maine's Legislature and other

fishery management meetings. At these meetings, I actively represent the interests of the membership in the discussion of policy and regulations and provide written summaries of meetings to the membership through the monthly newsletter. I also serve on the Board of Directors on the Gulf of Maine Ocean Observing System and on Maine Sea Grant's Policy Advisory Committee.

## Background

4.    MLA was founded in 1954 by lobstermen, on the principles of unity and cooperation, to be a united voice for Maine's lobster fishery. The MLA engages on issues related to policy, research, conservation and education. The MLA engages on resource management at the local, state, interstate and federal levels.

5.    MLA's membership is comprised of nearly 1,200 individuals or businesses including lobstermen, dealers, and other marine related businesses, private businesses and individuals with an interest in commercial lobstering. The MLA is the largest commercial fishing association on the East Coast, and one of the largest commercial fishing organizations in the nation.

6.    The MLA is governed by a board of directors elected by the membership for 3 year terms during the MLA's annual meeting. The Board is currently comprised of 28 directors from locations from throughout Maine's coast. The MLA Directors represent the interests of commercial lobstermen including those who solely hold state permits and those who also hold a federal lobster permit. Maine's lobster industry is the primary source of income for its members and directors. The MLA is supported primarily by dues paid by the members of the association.

7.    Maine's lobster fishery is comprised of more than 7,000 small family owned vessels. These owner-operator businesses prosecute a day trip fishery from small boats less than 50 feet in length. These family businesses are the economic backbone of Maine's coastal communities and islands. In 2005, Maine's lobster industry landed more than 67 million pounds of lobster valued at more than $311 million with an estimated $1 billion contribution to Maine's economy.

8.    Recent scientific surveys have shown the lobster industry is fishing at sustainable levels. The MLA is proud of its conservation efforts, including its support of v-notching egg bearing female lobsters so they can never be commercially harvested. The MLA has also strongly supported the State's minimum and maximum lobster size requirements as part of an overall effective conservation strategy that has led to recent record landings in the lobster industry.

9.     Maine lobstermen fish for lobsters by stringing together anywhere from two to twenty-five lobster traps with rope. In almost all instances the rope used is a polypropelene line that floats an average of ten feet off the seafloor. This prevents the rope from abrading on the rocky seafloor off most of Maine's coast, and prevents the groundline from being ensnared in underwater rock outcroppings. Left to "soak" for no more than two weeks, lobstermen map the location of their traps and attach at either one or both ends of the string of pots, a line with a floating buoy that identifies the location and the owner of the traps After the appropriate soak period, fishermen return to their traps and pull them up, using the buoy line, which is run through a hydraulically operated winch generally located on the starboard side of the wheel house of the vessel, while the operator or his crew member stands by to bring the traps aboard, empty the lobsters and rebait the pots.

10.    In 2006, Maine had 5,764 commercial license holders, 860 students and 408 apprentices (non-trap license) for a total of 7,032 licenses. Of these 7,032 lobster license holders in Maine, less than 1,400 hold federal lobster trap permits that allow them to fish outside Maine's 3 mile state waters boundary. According to a recent State of Maine report only 225 lobstermen are known to fish beyond 12 miles from shore and only four, beyond 40 miles from shore.

**MLA's Involvement in the Regulatory Process**

11.    The MLA has been actively involved in  studying the potential for, and finding ways to minimize the incidence of, injuries to large whales from lobster gear since the National Marine Fisheries Service ("NMFS") convened the first Atlantic Large Whale Take Reduction Team ("ALWTRT") in August of 1996.  It was at that time NMFS changed the classification of the Gulf of Maine and Mid-Atlantic Lobster Pot Fisheries (now called the Northeast/Mid-Atlantic American Lobster Trap/Pot fishery) from Category III to Category I (1997 List of Fisheries, 62 Fed. Reg. 33 (Jan. 2, 1997)), under the Marine Mammal Protection Act.

12.    This change in classification indicates that there have been interactions between lobster gear and large whales that had not been observed in the fishery before. More specifically, large whales were observed to have been injured, and in some cases died, from becoming entangled in the rope that leads from the lobster pots on the sea floor to a surface buoy that helps lobstermen locate and retrieve their gear. It is also thought that the floating rope that connects a string of lobster pots together may also pose a risk of entanglement, although to my knowledge there are no documented cases of large whales becoming entangled in Maine lobster trap groundlines.

**DECLARATION OF PATRICE E. McCARRON – PAGE 3**

13.    The MLA has actively participated in the ALWTRT processes for more than 10 years in order to assist in developing a conservation plan to protect large whales, while keeping the lobster industry economically viable.

14.    The ALWTRT functions as an advisory body to NMFS on whale conservation issues. Its membership comprises a variety of interests ranging from state and federal regulatory officials, representatives of conservation groups, and recreational and commercial fishing participants from along the entire Eastern Seaboard. The ALWTRT advises NMFS on large whale issues that range the entire length of the east coast and is a consensus based process.

15.    Given the disparate interests covering such a broad geographic area and a wide array of different fisheries, the ALWTRT has proven ineffectual in developing tailored advice on issues facing particular fisheries. Rather, it tends to only provide broad and homogenous management recommendations, such as can be reached by consensus, which often do not work for particular fisheries, particularly the Maine lobster fishery.

16.    The MLA has also been actively engaged in all meetings related to the development by NMFS, with ALWTRT advice, of all iterations of the Atlantic Large Whale Take Reduction Plan. The organization's involvement has also included submitting detailed comments to NMFS with regard to the development of the original Atlantic Large Whale Take Reduction Plan (including the Draft Large Whale Take Reduction Plan and Interim Final Rule in 1997 and the Final Rule in 1999).

17.    The MLA continued its involvement over several more iterations of the Plan including the 2002 Final Rule to Amend and Expand Gear Modifications (included 2000 Interim Final Rule, 2001 Proposed Rule and its accompanying Environmental Assessment), the 2002 Dynamic Area Management Final Rule (included 2001 Proposed Rule and Environmental Assessment, the 2003 Dynamic Area Management Gear Modifications Final Rule) (including the 2003 Proposed Rule and Final Environmental Assessment). Finally, the MLA has been involved in the current process for Broad Based Gear Modifications which has included scoping meetings in 2003, and then the release of the Draft Environmental Impact Statement and Proposed Rule in 2005. 70 Fed. Reg. 35894 (June 21, 2005)

18.    Since the beginning of our involvement on the large whale bycatch issue, the MLA has regularly consulted with staff at NMFS, both its Northeast Regional Office and national headquarters in Silver Spring, Maryland, the Maine Department of Marine Resources, Maine's Congressional delegation, Maine's Governor and Legislature in an effort to facilitate open communications.

19.    The MLA has worked hard to encourage NMFS through the ALWTRT process, written comments and communications with staff to create a whale plan based on

**DECLARATION OF PATRICE F. McCARRON – PAGE 4**

the best available science and common sense in order to provide protection to large whales without putting Maine's lobster industry unnecessarily at risk. Maine's lobster industry supported the concept of creating gear technology lists to allow lobstermen from different areas to choose gear modifications which were best suited to how they fish. The MLA has never supported the concept of uniform gear modifications covering broad and geographically distinct regions, because, by their very nature, such regulations fail to take into account unique local factors. These factors include how lobstermen fish in different areas, the characteristics of the seafloor, practicable regional alternatives, and the presence and behavior of whales.

20.     The MLA also provides education and outreach to the lobster industry on status of the Atlantic Large Whale Take Reduction Team and Take Reduction Plan through the MLA monthly newsletter. The MLA has hosted staff from the National Marine Fisheries Service, Maine Department of Marine Resources ("DMR"), New England Aquarium and Congressional delegation to participate at MLA Directors meetings and seminars at the Maine Fishermen's Forum, an annual conference for Maine's fishing industry.

21.     The Maine lobster industry has an excellent track record of complying with the current regulations in place to protect right whales, despite the fact that most Maine lobstermen have never observed a right whale and do not believe that their gear poses a risk. The Maine Department of Marine Resources Marine Patrol reports a 98 percent compliance rate in 2005 with the requirements to provide what is known as a "weak link" in the rope that attaches the pots to the buoy that floats on the surface, allowing the line to break, reducing the likelihood of entanglement, if a whale comes in contact with it. The Maine lobster industry also has a 98 percent compliance rate with Dynamic Area Management ("DAM") zone provisions, which require lobstermen to only fish with lobster pot gear that has the highest level of whale safe technology in an area once a threshold number of right whales are spotted in close proximity to each other. To the best of my knowledge, this level of compliance exceeds that observed in other states.

**The State of Scientific Knowledge with Respect to Whale Entanglements**

22.     Of the more than 10,000 right whale sightings over the past 35 years, fewer than 10 have occurred in Maine state waters. During 2001-2005 time period, 24 right whales have been observed entangled in fishing gear; however, NMFS has only 1 confirmed entanglement in lobster gear fished from the state of Maine.

23.     I understand that scientists believe that large whales are at risk of entanglement in groundlines between lobster traps when they are diving deep during feeding activities. To the best of my knowledge, the only scientific studies examining the feeding behavior of right whales have occurred on soft bottom areas in Cape Cod Bay, the Great South Channel and the Bay of Fundy, where right whales have been observed feeding. Scientists have not conducted right whale feeding studies

in nearshore rocky bottom habitats common to the Maine coast where the vast majority of Maine lobstermen set their gear because whales are not known to frequent these areas.

24.  NMFS has granted only 3 permits to tag right whales to study their behavior. Therefore, little is actually know about how and where right whales spend their time outside of Cape Cod Bay and Bay of Fundy critical habitats, and breeding grounds off the south Atlantic coast.

25.  The majority of whale sightings off the Maine coast do not occur in areas where most Maine lobster fishing occurs, or coincide with the times when fishing takes place.  Indeed, an examination of Maine's fishing effort in relation to the known location of right whales indicates only a few areas in Maine of potential interaction between right whales and lobster gear.  These areas are well known and lobstermen have changed over to sinking groundline (thought to be whale safe) due to current DAM measures. In addition to using sinking groundlines when NMFS declares a DAM, Maine lobstermen fish sinking line voluntarily out of precaution in areas where there is a likelihood of a right whale entering the area.  This type of rope is used in areas around Jeffrey's Ledge, an area off the southern Maine coast, and offshore areas where right whale migration is know to occur.

26.  Over the past 5 years, right whale sightings which have led to NMFS declaring a DAM zone off Maine have occurred on average 57 miles from the Maine coastline, except for Jeffrey's Ledge off the southern Maine coast where these whale sightings have averaged 31 miles from shore according to data provided by the Maine DMR.  Of the over 7,000 licensed Maine lobstermen, only four are known to fish more than 40 miles from shore and only 225 are known to fish more than twelve miles from shore. Maine DMR reports a 98 percent sinking groundline compliance in these DAMs in 2005.  Jeffrey's Ledge is a relatively soft bottom, gravelly area where right whales have been observed feeding.  Due to the bottom type in this region, lobstermen can successfully fish sinking groundlines.

**Problems with the Rulemaking at Issue**

27.  The Preferred Alternatives for Broad Based Gear Modifications put forward through the 2005 Proposed Rules to amend the Atlantic Large Whale Take Reduction Plan (2005 Taking of Marine Mammals, 70 Fed. Reg. 35894 (June 21, 2005)), would require a ban on the use of floating groundline in most Maine waters.  NMFS has proposed a very narrow exemption area which affects only those lobstermen who fish the majority of their traps way up in the bays and inside the islands.  These lobstermen are typically old-timers winding down towards retirement or young kids making some money on the side.  The NMFS proposed exemption area would not cover most of the fishing grounds of full-time

lobstermen. In reality the proposed exemption line would bifurcate the lobstermen's fishing grounds requiring lobstermen to rig two sets of gear to be fished on either side of the exemption line, if, as the majority of them would do, a lobsterman fishes traps on either side of the exemption line.

28. NMFS has not been able to demonstrate the benefits to large whales of eliminating floating groundlines, because to my knowledge there is no documentation of a large whale becoming entangled in a groundline. There is no scientific data to support the management proposals. Right whales are too rare to test these proposals in Maine, and NMFS has not issued permits to test the effects of these gear modifications in areas of known right whale aggregations such as Cape Cod Bay critical habitat.

29. Maine lobstermen cannot fish sinking groundline on the very rough rocky bottom, strong tides and currents found seaward of most of Maine's coastline. Floating groundlines float above the bottom so that the rope is not weakened and cut off on jagged rocks and it does not get stuck or entwined under large rocks and boulders. Floating rope is economical, generally costing approximately $1.40 per pound and lasting 7 to 9 years before needing replacement. Because floating rope does not often get hung down or part off, it also presents less of a safety risk during hauling back.

30. Sinking rope, by contrast, is much more expensive and far less durable than the floating groundline and will quickly abrade in Maine's rocky, tidal, and current-swept ocean bottom and become "hung down" on outcroppings of jagged rock and boulders. As a result, these more expensive sinking groundlines, which cost from $2.00 up to $4.00 per pound will need replacement far more often than existing floating groundlines do. A recent survey of Maine lobstermen conducted by the Gulf of Maine Lobster Foundation ("GOMLF"), which is planning to conduct a floating rope buy back program if necessitated by regulations banning floating groundline, found that the average lobsterman anticipates the cost of changing from floating groundlines to sinking groundlines to be $15,000. This sinking rope is expected to have a life expectancy of 2 to 3 years which will lead to annual replacement costs of $5,000 to $7,500 per year. This is in comparison to floating lines which are known to have a life expectancy of 7 to 9 years which leads to an average annual replacement cost of $1,100 to $1,425.

31. Converting a lobster business to sinking groundline would also lead to additional economic burden due to loss and replacement of lobster traps. An average lobster business currently loses approximately 10 percent of its traps each year due to weather, boat traffic and fishing losses, but may recover approximately one half of those the following year. Fishing sinking rope would have a varying effect on the extent of additional loss of traps depending on which part of the Maine coast is fished. The problem would become more severe as you move from west to east as the bottom type becomes much harder and more severe and the tidal fluctuations increase as you near the Bay of Fundy. In eastern Maine and around

some of the islands, additional trap loss is anticipated to be as high as 50 percent of gear fished due to hang downs and gear chafing. The majority of this gear could not be recovered as it would be stuck under rocks. Areas of southern Maine would likely only lose up to an additional 10 percent of gear. Lobster traps cost on average $70 per trap.

32.    The State of Maine currently has a policy of issuing 10 percent replacement of lobster trap tags to allow a lobsterman to legally fish new traps in place of those lost. The State of Maine requires lobstermen to have a State lobster license tag present on every lobster trap being fished. The tags include markings that identify the license holder and a lobsterman may only fish lobster traps with his own tags: he may not ever fish traps with someone else's tags, not even a family member's. Therefore, a lobsterman's ability to replace gear lost due to fishing sinking line would be greatly inhibited due to a lack of replacement trap tags. Once a lobsterman loses 10 percent of his traps, he must claim a catastrophic loss and get a full set of trap tags reissued. It is then not possible to have an additional 10 percent issuance of replacement tags. This is a serious economic burden which may cause a delay in a lobsterman's ability to legally fish traps, and will cost both time and money to get new tags issued.

33.    Requiring lobstermen to fish with sinking line on rocky bottom presents serious safety issues. Lobster traps are hydraulically pulled up to the surface, a hang down can cause a lobster boat to suddenly heel over and can capsize a vessel suddenly throwing all onboard into Maine's frigid coastal waters. A hang down may also put significant strain on the hydraulic hauler and block and tackle assembly used to haul the traps to the surface. Under significant strain, the block and tackle or hauler can fail, an event that can cause serious bodily injuries or death.

34.    The MLA has long recognized the shortcomings of the broad based gear modifications proposed by NMFS. The MLA has proposed exempting from a ban on sinking groundline waters shallower than fifty fathoms. This exemption area focuses on the rocky bottom portions of Maine where whale sightings are few, the habitat is not known to be conducive to feeding by whales, and the terrain makes use of sinking groundline a practical impossibility and a hazard to the safety of fishermen.

## MLA's Whale Conservation and Gear Research Efforts

35.    MLA has been working diligently to help reduce potential risks its lines present to right whales and other marine mammals. MLA has not opposed, and, indeed, its members currently utilize, sinking rope in sandy, muddy and gravely bottom areas, primarily off the southern part of the state and in some offshore areas, even where its use is not required. These areas of soft bottom where sinking rope is

**DECLARATION OF PATRICE F. McCARRON – PAGE 8**

Maine's rocky habitats and behavior of sinking, floating and experimental ropes actively fished.

42.   In 2004 and 2005, lobstermen developed their own variations of experimental ropes to reduce the profile of the ropes in the water such as weighted floating line (i.e. splicing in lead line and adding lead weights) and splicing floating and sinking ropes together to lower the profile. The MLA coordinated additional vessels to serve as a platform for follow-up underwater video surveys in collaboration with the Maine DMR.

43.   In 2005 and 2006, more than 75 Maine lobstermen participated in testing experimental low profile ropes developed by Hy-liner and Polysteel Atlantic rope manufacturers at the request of the DMR. Lobstermen tested two low profile ropes in 2005 and four low profile ropes in 2006 to evaluate the operational feasibility of the rope based on the field trials. These sinking groundlines rated poorly among fishermen in Mid Coast and Downeast Maine and lasted only a couple of months. The sinking groundlines did perform well in Southern Maine.

44.   In 2006, Maine lobstermen worked with the DMR and the Gulf of Maine Lobster Foundation to deploy pressure sensors on four types of experimental low profile groundlines to document the height of rope off the bottom based on real fishing conditions and compare it to the height of floating groundlines. The experimental low profile ropes were consistently a meter or less off the bottom.

45.   The Gulf of Maine Lobster Foundation is working with lobstermen to distribute and test off the shelf _" heavy duty sinking ropes, which is much thicker in diameter than 3/8" rope lobstermen typically use, in extreme rocky bottom areas to determine if this durable rope is operationally feasible.

46.   The Maine Lobstermen's Association has been testing two types of sinking line including a barium sulfate sinking line and a Teflon coated braided rope and three experimental endline concepts including glow rope, weak rope and stiff ropes through the Consortium for Wildlife Bycatch Reduction.

47.   These efforts show the dedication and commitment of the Maine lobster industry to finding practicable solutions to a recognized problem, albeit one that has been overstated with respect to the near-shore, rocky areas where the overwhelming majority of Maine's lobster fishing effort occurs.

### MLA has a Significant Interest in the Case

48.   As mentioned above, the ALWTRT process is a consensus process involving various stakeholders with widely divergent interests and goals. The ALWTRT process has taken as long as it has taken because of the lack of consensus amongst various stakeholders and interest groups. The MLA, as documented above, has worked diligently to move large whale protections forward. What MLA has

fished generally correspond with the sightings of right whales. The industry understands that no take of a large whale is acceptable.

36.  The Maine lobster industry has been involved in a variety of broad-based efforts to develop and test experimental gear aimed at making both buoy lines and groundlines more whale safe. The MLA has collaborated with researchers both within the state of Maine and in the region. The Maine lobster industry has worked with Maine's Department of Marine Resources ("DMR") and NMFS to test a variety of experimental gear designs. The MLA is a member of the Consortium for Wildlife Bycatch Reduction based at the New England Aquarium whose mission is to identify and promote practical solutions for eliminating bycatch as a threat to endangered species, ecosystem health, and sustainable fishing.

37.  In 1998, Maine lobstermen also participated in a NMFS "in situ" survey to understand how gear deployment might affect gear profiles in the water column to determine its potential to entangle marine mammals at 3 sites along the Maine coast. In 1999, Maine lobstermen participated in a NMFS funded study to develop a bottom weak link and buoy line messenger system.

38.  In 2000, Maine's lobster industry collaborated with the Maine DMR and NMFS to help develop viable weak link options for vertical buoy lines and establish an appropriate breaking strength. Several options have been adopted by NMFS including the use of hog rings, tucks and hitches, and off the shelf weak links. Members of Maine's lobster industry collaborated with DMR and NMFS to develop operationally feasible buoy line marking techniques. In the unlikely event of an entanglement, such marking efforts could help better target conservation measures.

39.  In 2000, based on ideas brought forward by Maine lobstermen, NMFS had a small amount of sinking line produced as a technological approach to reduce the amount of floating line used in the lobster fishery. Maine lobstermen participated in testing this rope and hosting NMFS' Gear Specialist and a diver to video tape this experimental rope. From 2000 to 2003 NMFS produced and distributed more than 300 coils of sinking, or "neutrally buoyant" rope and distributed it to lobstermen. More than 55 Maine lobstermen tested the rope.

40.  In 2002 and 2003, more than 200 Maine lobstermen participated in species identification and behavioral training workshops to assist in reporting whale sightings and disentangling whales. Eight lobstermen located strategically along the coast currently have their own set of disentanglement tools. On the rare occasions when whales have been entangled in Maine waters, many lobstermen have successfully assisted in the disentanglement efforts.

41.  In 2003 and 2004, the MLA organized more than 25 vessels along the entire Maine coast to participate in the DMR underwater video survey to document

sought and still seeks, are rules that protect large whales while allowing lobstermen to continue to prosecute their sustainable fishery.

49.   The potential elimination of floating groundline along the Maine coastline in NMFS' proposed rule greatly concerns the MLA because of the economic and safety concerns raised above.  MLA is concerned that any court ordered timeline for the issuance of a rule will force out regulations that will unnecessarily negatively impact how lobstermen conduct their livelihood and have no demonstrable benefit to large whales.

FURTHER DECLARANT SAYETH NOT.

SIGNED UNDER THE PENALTIES OF PERJURY THIS __12__ DAY OF APRIL 2007.

Patrice F. McCarron

DECLARATION OF PATRICE F. McCARRON – PAGE 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>THE HONORABLE<br> CARLOS M. GUTIERREZ, *et al.*,<br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )  Civ. No. 1:07-cv-00333-ESH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PROPOSED ANSWER OF MOVANT MAINE LOBSTERMEN'S ASSOCIATION**

COMES NOW the Maine Lobstermen's Association ("MLA"), and in answer to Plaintiffs' Complaint hereby admits, denies, and avers as follows:

**INTRODUCTION**

1.    The allegations in paragraph 1 are a characterization of Plaintiffs' case, to which no response is required, and the terms of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1362-1421h, which is a provision of law that speaks for itself. To the extent a response is required, MLA denies the allegations in paragraph 1.

2.    The allegations in the first sentence of paragraph 2 are a characterization of Plaintiffs' case, to which no response is required, and the terms of the MMPA, 16 U.S.C. § 1387(f), which is a provision of law that speaks for itself. MLA avers that any document listing the species as endangered pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, is the best evidence of its contents, although it further avers that to the best of its knowledge, the whale species at issue are so listed. The remaining allegations of the second

sentence are conclusions of law to which no response is required. Otherwise, MLA denies the allegations in paragraph 2.

3.      The allegations in paragraph 3 are a characterization of Plaintiffs' case and conclusions of law, to which no response is required.  To the extent a response is requires, MLA denies the allegations in paragraph 3..

## JURISDICTION AND VENUE

4.      The allegations in paragraph 4 constitute Plaintiffs characterization of their case, to which no response is required, and the remaining allegations in paragraph 4 purport to characterize 28 U.S.C. §§ 1331 & 1361, statutes which speak for themselves.

5.      The allegation in paragraph 5 regarding venue is a conclusion of law to which no response is required.

## PARTIES

6.      MLA is without sufficient information or knowledge to form a belief as to the truth of the allegations in paragraph 6 and on that basis denies the same.

7.      The allegations in paragraph 7 in part constitute a characterization of Plaintiffs' case, to which no response is required.  MLA is without sufficient information or knowledge to form a belief as to the truth of the remaining allegations in paragraph 7 and on that basis denies the same.

8.      MLA is without sufficient information or knowledge to form a belief as to the truth of the allegations in paragraph 8 and on that basis denies the same.

9.      The allegations in paragraph 9 in part constitute a characterization of Plaintiffs' case, to which no response is required.  MLA is without sufficient information or knowledge to

form a belief as to the truth of the remaining allegations in paragraph 9 and on that basis denies the same.

10.    Admits that Defendant Carlos Gutierrez is Secretary of Commerce, and avers that that such, Secretary Gutierrez has responsibility for the agencies within the Commerce Department.  MLA denies any implication with respect to the Secretary's responsibility inconsistent with this authority.  The allegations in the second sentence of paragraph 10 constitute a characterization of Plaintiffs' case, to which no response is required.

11.    Admits that Dr. William T. Hogarth serves as Assistant Administrator for Fisheries and that NOAA Fisheries, officially referred to as the National Marine Fisheries Service, is an agency within the Department of Commerce.   As to the remaining allegations in the first sentence of paragraph 11, admits that NOAA Fisheries has been generally delegated authority over threatened and endangered marine species in the marine environment, and avers that any such delegation of authority represents the best evidence of its contents, and therefore denies Plaintiffs characterization of the same.  The allegations in the second sentence of paragraph 11 constitute a characterization of Plaintiffs' case, to which no response is required.

12.    Paragraph 12 is a characterization of Plaintiffs' case, to which no response is required.

**STATUTORY BACKGROUND**

13.    Denies the allegations contained in the first sentence of paragraph 13 as they purport to characterize 16 U.S.C. § 1361(1), (6), a statue which speaks for itself and is the best evidence of its contents.  Denies the allegations in the second sentence of paragraph 13 as they purport to characterize 16 U.S.C. § 1361(2) & 1362(9), statues which speak for themselves and

which are the best evidence of their contents. MLA denies any remaining allegations contained in paragraph 13.

14.    MLA denies any allegations contained in the first sentence of paragraph 14 to the extent that they are inconsistent with the express terms of the MMPA. Denies the allegations in the second and third sentence of paragraph 14 as they purport to characterize 16 U.S.C. § 1371(a)(1) & 1362(13), statues which speak for themselves and which are the best evidence of their contents. MLA denies any remaining allegations contained in paragraph 14.

15.    Denies the allegations contained in paragraph 15 as they purport to characterize 16 U.S.C. § 1387(a)(1)), a statute which speaks for itself and which is the best evidence of its contents.

16.    Denies the allegations contained in first, third and forth sentences of paragraph 16 as they purport to characterize 16 U.S.C. §§ 1387(c)(1)(A)(i), (ii), 1387(c)(2)(A), and 1387(c)(3)(A)(iii), (iv), statutes which speak for themselves and which are the best evidence of their contents. The allegations contained in the second sentence of paragraph 16 purport to characterize the "list of fisheries," a document which speaks for itself and is the best evidence of its contents, and the requirements of section 118 of the MMPA, a provision of law which speaks for itself. MLA denies any remaining allegations contained in paragraph 16.

17.    Denies the allegations contained in paragraph 17 as they purport to characterize 16 U.S.C. §§ 1387(f)(1) & 1362(19), statutes which speak for themselves and are the best evidence of their contents. MLA denies any remaining allegations contained in paragraph 17.

18.    Denies the allegations contained in the first and second sentences of paragraph 18 as they purport to characterize 16 U.S.C. §§ 1387(f)(2) and 1362(20), statutes which speak for themselves and are the best evidence of their contents. The allegations in the third sentence of

**Proposed Answer of Movant MLA- Page 4**

paragraph 18 appear to purport to characterize the requirements of the MMPA, and MLA denies

any characterization of the law inconsistent with its express terms. MLA denies any remaining

allegations contained in paragraph 18.

19.    Denies the allegations contained in paragraph 19 as they purport to characterize

16 U.S.C. § 1387(f)(6)(A)(i), (ii), (f)(6)(C), a statute which speaks for itself and is the best

evidence of its contents. MLA denies any remaining allegations contained in paragraph 19.

20.    Denies the allegations contained in paragraph 20 as they purport to characterize

16 U.S.C. §§ 1387(f)(7), 1387(f)(7)(A)(i), 1387(f)(7)(B)(i), (ii), 1387(f)(7)(C), 1387(f)(8), and

1387(f)(8)(C), statutes which speaks for themselves and are the best evidence of their contents.

MLA denies any remaining allegations contained in paragraph 20.

21.    Denies the allegations contained in paragraph 21 as they purport to characterize

16 U.S.C. § 1387(f)(7)(F), (f)(8)(F), a statute which speaks for itself and is the best evidence of

its contents. MLA denies any remaining allegations contained in paragraph 21.

22.    Denies the allegations contained in paragraph 22 as they purport to characterize 5

U.S.C. § 706(1), a statute which speaks for itself and is the best evidence of its contents.

## FACTUAL BACKGROUND

**A.**

23.    MLA avers that whales have been known to have become entangled in

commercial fishing gear, leading to injury and even death in certain instances, and further avers

that its members have taken extraordinary steps to avoid and mitigate such harm. MLA is

without specific information or belief as to the remaining allegations contained in paragraph 23,

and on that basis denies them, averring that any documents relating to the specific instances,

impacts, numbers of entangled whales, and other information contained in paragraph 23 are the

best evidence of their contents. Finally, MLA has no knowledge or belief as to the allegation

contained in the final sentence relating to what issues scientists believe to be major animal

issues, and on that basis denies the allegations contained in the last sentence of paragraph 23.

MLA denies any remaining allegations contained in paragraph 23.

24.    MLA avers that the stocks at issue have been determined to be "strategic stocks"

that have interactions with certain commercial fisheries and are protected under the MMPA.

MLA further avers that any declaration of the stocks at issue is the best evidence of its contents,

and on that basis denies any characterization in the first sentence of paragraph 24 inconsistent

with that declaration. MLA admits that the stocks at issue are considered endangered within the

meaning of the ESA, but is without information or belief necessary to form an opinion about the

remaining allegations contained in the second and third sentences of paragraph 24, and on that

basis, denies the same. MLA denies any remaining allegations contained in paragraph 24.

25.    Denies the allegations contained in the first sentence of paragraph 25, and avers

that scientists now estimate the population of the North Atlantic right whale at 450 individuals.

Denies the allegations in the second sentence of paragraph 25 as they purport to characterize the

contents of 35 Fed. Reg. 8495 (June 2, 1970), a document which speaks for itself and which is

the best evidence of its contents. Denies the allegations in the third sentence of paragraph 25 as

they purport to characterize the contents of 60 Fed. Reg. 30857, 30858 (June 1, 2004), a

document which speaks for itself and which is the best evidence of its contents. Denies the

allegations in the final sentence of paragraph 25 to the extent that they are inconsistent with the

authorities cited, which are the best evidence of their contents and documents which speak for

themselves.

**Proposed Answer of Movant MLA- Page 6**

26.    Denies the allegations contained in paragraph 26 as they purport to characterize the contents of the 2005 NOAA Fisheries U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessment, which is the best evidence of its contents and a document which speaks for itself.

27.    Avers that the humpback whale is considered an endangered species for purposes of the ESA, but denies the remaining allegations contained in paragraph 27 as they purport to characterize the contents of the 2005 NOAA Fisheries U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessment, which is the best evidence of its contents and a document which speaks for itself.

28.    Denies the allegations contained in the first and second sentences of paragraph 28 as they purport to characterize the contents of the 2005 & 2007 NOAA Fisheries U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessment, which are the best evidence of its contents and documents which speaks for themselves.  MLA is without information or belief as to the truth or accuracy of the allegations contained in the third sentence of paragraph 28, and on that basis denies the same.

29.    Avers that the fin whale is considered an endangered species for purposes of the ESA, but denies the remaining allegations contained in the first sentence of paragraph 29 to the extent that they are inconsistent with the best scientific information available.  Denies the allegations contained in the second sentence of paragraph 29 as they purport to characterize the contents of the 2005 NOAA Fisheries U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessment, which is the best evidence of its contents and a document which speaks for itself. Denies the allegations contained in the third and forth sentences of paragraph 29 as they purport to characterize the NOAA fisheries estimates and proposed Recovery Plan, which are the best

evidence of their contents and documents which speak for themselves. Denies the allegations in

the final sentence of paragraph 29 as they purport to characterize the contents of the 2005 and the

Draft 2007 Stock Assessment, which are the best evidence of their contents and documents

which speak for themselves.

 **B.**

 30. MLA avers that meetings of the Atlantic Large Whale Take Reduction Team

("ALWTRT") have occurred periodically since 1996; that the ALWTRT generally has the

responsibility for recommending measures to reduce the incidence of takes of large whales; and

that the ALWTRT did not reach a consensus position, but is without sufficient information or

knowledge to form a belief as to the motivations of NOAA Fisheries in convening such meetings

or the truth of any of the other allegations contained in the first three sentences of paragraph 30

and on that basis denies the same. Denies the last two sentences of paragraph 30 as they purport

to characterize the contents of 62 Fed. Reg. 39,157 (July 22, 1997) and 64 Fed. Reg. 7529 (Feb.

16, 1999), which are the best evidence of their contents and documents which speak for

themselves. MLA denies any remaining allegations contained in paragraph 30.

 31. Denies the allegations contained in the first sentence of paragraph 31. Denies the

allegations contained in the second, third, and forth sentences of paragraph 31 as they purport to

characterize the contents of 70 Fed. Reg. 35, 894, 35,895 (June 21, 2005), which is the best

evidence of its contents and a document which speaks for itself. MLA is without sufficient

information or knowledge to form a belief as to the truth of the allegations contained in the last

sentence of paragraph 31 and on that basis denies the same.

 32. MLA is without sufficient information or knowledge to form a belief as to the

truth of the allegations contained in the first two sentences of paragraph 32 and on that basis

denies the same.  The allegations in the third sentence of paragraph 32 constitute conclusions of

law and a statement of Plaintiffs' case, to which no response is required.  To the extent a

response is required, MLA denies the allegations contained in the last sentence of paragraph 32.

33.     Denies the allegations contained in the first sentence of paragraph 33, as they

purport to characterize the contents of 70 Fed. Reg. 40,301 (July, 31, 2005), which is the best

evidence of its contents and a document which speaks for itself.  The allegations in the third

sentence of paragraph 32 constitutes conclusions of law and a statement of Plaintiffs' case, to

which no response is required.  To the extent a response is required, MLA denies the allegations

contained in the last sentence of paragraph 32.

## PLAINTIFF'S CLAIMS FOR RELIEF

34.     MLA realleges and incorporates by reference its answers to paragraphs 1 through

33 as if fully set forth herein.

35.     Denies.

36.     Denies.

## REQUEST FOR RELIEF

WHEREFORE, the Court should enter final judgment denying Plaintiff's claims and the

relief Plaintiffs have requested.

Dated:  April 16, 2007                         Respectfully submitted,

                                               _____
                                               David E. Frulla  (D.C. Bar No. 414170)
                                               Shaun M. Gehan (D.C. Bar No. 483720)
                                               Andrew Minkiewicz (MA Bar No. 651209)
                                               KELLEY DRYE & WARREN, LLP
                                               3050 K Street, NW – Suite 400
                                               Washington, DC  20007

                                               Attorneys for Movant, Maine Lobstermen's
                                               Association

**Proposed Answer of Movant MLA- Page 9**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES,** *et al.,* | ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Civ. No. 1:07-cv-00333-ESH** ) ) |
| **THE HONORABLE CARLOS M. GUTIERREZ,** *et al.* | ) ) ) |
| **Defendants.** | ) ) ) |

## MAINE LOBSTERMEN'S ASSOCIATION'S DISCLOSURE AND CERTIFICATION OF CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS

Pursuant to LCvR 7.1, movant Maine Lobstermen's Association ("MLA") submits the following certification:

I, David E. Frulla, counsel of record for MLA certify that to the best of my knowledge and belief, MLA does not have any parent companies, subsidiaries or affiliates, which have any outstanding securities in the hands of the public.

Dated:  April 16, 2007

Respectfully submitted,

David E. Frulla  (D.C. Bar No. 414170)
Shaun M. Gehan (D.C. Bar No. 483720)
Andrew Minkiewicz (MA Bar No. 651209)
KELLEY DRYE & WARREN, LLP
3050 K Street, NW – Suite 400
Washington, DC  20007
Telephone:  (202) 342-8400
Facsimile: (202) 342-8451

Attorneys for Movant, Maine Lobstermen's Association