UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                                    )
THE HUMANE SOCIETY OF THE                           )
UNITED STATES                                       )    Civ. No. 07-0333 (ESH)
and THE OCEAN CONSERVANCY,                           )
                                                    )
            Plaintiffs,                              )
                                                    )
      v.                                             )
                                                    )
CARLOS M. GUTIERREZ, et. al.,                        )
                                                    )
            Defendants.                              )
———————————————————————)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute, and Plaintiffs are entitled to judgment as a matter of law. In support of this motion, Plaintiffs submit the accompanying memorandum of law, a statement of material facts as to which there is no genuine issue, the declarations of Sharon Young and John Phillips, and a proposed order. Due to the critically imperiled status of the whale species at issue in this case, Plaintiffs respectfully request that this motion receive expedited consideration by the Court.

Respectfully submitted,

  /s/ Sarah Uhlemann
Sarah Uhlemann
DC Bar No. 501328
Jonathan Lovvorn
DC Bar No. 461163
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20037

*Attorneys for Plaintiff The Humane Society of the United States*

 /s/ Sierra B. Weaver
Sierra B. Weaver
DC Bar No. 488560
Coby Dolan
DC Bar No. 483237
The Ocean Conservancy
2029 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiff The Ocean Conservancy*

May 23, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………...…………………...iii

INTRODUCTION……………………………………………...………………...…..1

STATUTORY AND FACTUAL BACKGROUND...........................................................3

       A.     Marine Mammal Protection Act..…………………………………3

       B.     Endangered Species Act……………..…………………….........6

       C.     The Three Endangered Whale Species………..…………………7

       D.     The Atlantic Large Whale Take Reduction Plan…………….…..10

ARGUMENT……………………………………………………………...………...13

   I.     Defendants Are Violating the MMPA and Should Be
        Compelled to Comply With The Statute Within 30 Days.……..............14

       A.     Defendants Violated the MMPA by Failing To
             Issue a Final Amended Take Reduction Plan by
             the Statutory Deadline……………………………..……………….14

       B.     Because Congress Has Already Determined the Agencies'
             Order of Priorities, the Court Should Compel Defendants to
             Issue a Final Amended Take Reduction Plan Immediately…........15

       C.     In the Alternative, This Court Should Compel Defendants
             To Issue a Final Take Reduction Plan Under the
             TRAC Factors……………………………………...……….19

            1.     The MMPA Establishes Clear Statutory Deadlines
                  Requiring the Issuance of a Final Take Reduction
                  Plan Within 60 Days of the Close of the
                  Comment Period………………………………………....20

            2.     The Court Should Compel the Issuance of a Final Take
                  Reduction Plan in Light of Severe Environmental
                  Consequences of Defendants' Failure to Comply
                  with Statutory Deadline.…………………….........……21

3.    Protecting Critically Endangered Marine Mammals, like the North Atlantic Whale, Should be Defendants' Top Priority……………………………………………....22

CONCLUSION……………………………………………………………………..23

# TABLE OF AUTHORITIES

CASES

American Bioscience, Inc. v. Thompson,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................15, 23

In re American Rivers and Idaho Rivers United,
    372 F.3d 413 (D.C. Cir. 2004) ....................................................................23

Babbitt v. Sweet Home Chapter of Committee for a Great Ore.,
    515 U.S. 687 (1995)..................................................................................6

*In re Barr Laboratories, Inc.,
    930 F.2d 72 (D.C. Cir. 1991) ...............................................................15, 20

Bennett v. Spear,
    520 U.S. 154 (1997)................................................................................14

In re Bluewater Network,
    234 F.3d 1305 (D.C. Cir. 2000) ..................................................................22

Biodiversity Legal Foundation v. Badgley,
    309 F.3d 1166 (9th Cir. 2002) ....................................................................16

Cobell v. Norton,
    240 F.3d 1081 (D.C. Cir. 2001) ............................................................19, 21

*Cutler v. Hayes,
    818 F.2d 879 (D.C. Cir. 1987) ..............................................................21, 22

Environmental Defense Fund v. Ruckelshaus,
    439 F.2d 584 (D.C. Cir. 1971) ....................................................................22

Forest Guardians v. Babbitt,
    174 F.3d 1178 (10th Cir. 1999) ..................................................................18

Friends of the Earth v. Laidlaw Environmental Services,
    528 U.S. 167 (2000)................................................................................12

Japan Whaling Ass'n v. America Cetacean Social,
    478 U.S. 221 (1986)................................................................................12

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)................................................................................12

Mashpee Wampanoag Tribal Council, Inc. v. Norton,
    336 F.3d 1094 (D.C. Cir. 2003) ...................................................................15

Mead Corp. v. Browner,
    100 F.3d 152 (D.C. Cir. 1996) ....................................................................23

National Wildlife Federation v. Burlington National Railroad,
    23 F.3d 1508 (9th Cir. 1994) .....................................................................17

Norton v. Southern Utah Wilderness Alliance,
    542 U.S. 55 (2004) .....................................................................................13

Oil, Chemical and Atomic Workers International Union v. Zegeer,
    768 F.2d 1480 (D.C. Cir. 1985) ..................................................................23

Pierce v. Underwood,
    487 U.S. 552 (1988) ...................................................................................14

Telecommunications Research and Action Center v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) ............................................................. passim

*Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978) ........................................................................... passim

United States v. Monsanto,
    491 U.S. 600 (1989) ...................................................................................14

*United States v. Oakland Cannabis Buyers' Co-op.,
    532 U.S. 483 (2001) ..............................................................................15, 16

*Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982) ..............................................................................16, 17

## STATUTES

5 U.S.C. § 551(13)……………………………………………………............13

5 U.S.C. § 702 ...........................................................................................13

5 U.S.C. § 706(1) ............................................................................... passim

16 U.S.C. § 1361(1)……………………………………………….............3

16 U.S.C. § 1361(6) ......................................................................................3

16 U.S.C. § 1362(9)……………………………………………………………………..3

16 U.S.C. § 1362(11) ..................................................................................3, 4, 8, 10

16 U.S.C. § 1362(13)……………………………………………………...…4

16 U.S.C. § 1362(19)…………………………………………………………4, 8, 9, 10

16 U.S.C. § 1362(20)…………………………………………………………...4, 8

16 U.S.C. § 1387(c)…………………………………………………………………4

16 U.S.C. § 1387(f)...................................................................................... *passim*

16 U.S.C. § 1372(a)…………………………………………………..…………..4

16 U.S.C. § 1532(19)…………………………………………………………..7

16 U.S.C. § 1536(a)…………………………………………………….......7, 11, 12

16 U.S.C. § 1536(b)……………………………………………………………7

16 U.S.C. § 1538(a)………………………………………………….............7, 18

## REGULATIONS

50 C.F.R. § 402.02 ...................................................................................7, 12

50 C.F.R. § 402.14(i)…………………………………………………..............7

## LEGISLATIVE HISTORY

S. Rep. No. 103-220 (1994) ...................................................................4, 17, 21

## FEDERAL REGISTER NOTICES

35 Fed. Reg. 8495 (June 2, 1970) .................................................................8, 9

61 Fed. Reg. 40,819 (Aug. 6, 1996)..............................................................10

62 Fed. Reg. 16,519 (April 7, 1997)..............................................................10

62 Fed. Reg. 39,157 (July 22, 1997)..............................................................10

64 Fed. Reg. 7529 (Feb. 16, 1999) ...............................................................................10

69 Fed. Reg. 30,857 (June 1, 2004) ....................................................................... *passim*

70 Fed. Reg. 35,894 (June 21, 2005)……………………………………………...............*passim*

70 Fed. Reg. 40,301 (July 13, 2005) ....................................................................12, 20

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                            )
THE HUMANE SOCIETY OF THE              )    Civ. No. 07-0333 (ESH)
UNITED STATES; and THE OCEAN           )
CONSERVANCY,                           )    MEMORANDUM IN SUPPORT OF
                                            )    PLAINTIFFS' MOTION FOR
        Plaintiffs,                    )    SUMMARY JUDGMENT
                                            )
        v.                             )
                                            )
CARLOS M. GUTIERREZ, et al.,           )
                                            )
        Defendants.                    )
_____)

## <u>INTRODUCTION</u>

This action challenges the National Oceanic and Atmospheric Administration ("NOAA")
National Marine Fisheries Service's ("NOAA Fisheries") failure to comply with a strict statutory
deadline for the issuance of a final amended plan and regulations to protect endangered North
Atlantic right whales, humpback whales, and fin whales from death or serious injury by
entanglement in commercial fishing gear. Despite NOAA Fisheries' conclusion nearly 5 years
ago that the current Atlantic Large Whale Take Reduction Plan ("Take Reduction Plan") was
failing to protect endangered whales as required by the Marine Mammal Protection Act
("MMPA"), 16 U.S.C. §§ 1361–1421h, and the Endangered Species Act ("ESA"), 16 U.S.C.
§§ 1541–1544, the agency has violated the MMPA's strict deadline for finalizing those
amendments. The MMPA requires that "[n]ot later than <u>60 days</u> after the close of the comment
period [for the proposed amended plan and implementing regulations, NOAA Fisheries] <u>shall</u>
<u>issue</u> a final take reduction plan and implementing regulations." 16 U.S.C. § 1387(f)(7)(C), (8)(C)
(emphasis added). That deadline passed on October 21, 2005, and now, 19 months later, NOAA
Fisheries has still not issued a final rule.

Even in the time between the filing of Plaintiffs' Complaint and the filing of this motion for summary judgment, 2 entangled North Atlantic right whales were found, one dead after being seen entangled since 2002 and another whose condition was judged by scientists attempting to disentangle her as "life threatening." See Declaration of Sharon Young ("Young Decl.") ¶ 12. The two recent entanglements are particularly alarming given that the North Atlantic right whale is so imperiled that NOAA Fisheries has concluded that the death of even one animal could result in the extinction of the species. 69 Fed. Reg. 30,857, 30,858 (June 1, 2004).

NOAA Fisheries' continued failure to finalize measures that the agency concedes are necessary to protect endangered whale species from serious injury or death in fishing gear violates the strict deadlines set by Congress in the MMPA, 16 U.S.C. § 1387(f)(7)(C), (8)(C), and thus constitutes an action "unlawfully withheld," in violation of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(1). As discussed below, Plaintiffs believe that the Court can and should compel Defendants' prompt compliance with this statutory mandate without consideration of the equitable factors provided under Telecommunications Research and Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"). While TRAC is primarily concerned with balancing competing agency priorities, in this case, Congress has already determined the agency's priorities under the MMPA and the ESA. See, e.g., 16 U.S.C. § 1387(f)(3) ("the Secretary shall give highest priority to . . . species or stocks whose level of incidental mortality and serious injury exceeds the potential biological removal level, those that have a small population size, and those which are declining most rapidly") (emphasis added); Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978) (the ESA made "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities").

Alternatively, even if the court applies the <u>TRAC</u> factors in this case, this Court still should compel the agency to act. The MMPA mandates prompt issuance of the rule, the consequences of the agency's failure to act are severe as more endangered whales sustain death and serious injury due to entanglement, and the statute expressly determines the agency's priorities for it, elevating the protection of endangered above all other priorities. <u>TRAC</u>, 750 F.2d at 80; 16 U.S.C. § 1387(f)(3).

Therefore, Plaintiffs now seek summary judgment on Defendants' failure to finalize an amended Take Reduction Plan and implementing regulations, and seek an order compelling the agency to publish a final plan and regulations within 30 days. Due to the critically imperiled status of the species at issue, Plaintiffs respectfully request that this motion receive expedited consideration by the Court.

<u>**STATUTORY AND FACTUAL BACKGROUND**</u>

**A.    <u>Marine Mammal Protection Act</u>**

Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the MMPA in 1972 to ensure that marine mammals are "protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). Accordingly, the goal of the MMPA is to maintain an "optimum sustainable population" of each marine mammal stock,[1] defined as "the number of animals which will result in the maximum productivity of the population or the species," considering both carrying capacity of the habitat and ecosystem health. <u>Id.</u> §§ 1361(6), 1362(9).

---

[1] A "stock" under the MMPA is a group of interbreeding marine mammals of the same species inhabiting "a common spatial arrangement." 16 U.S.C. § 1362(11).

To attain this goal, the MMPA generally prohibits the unauthorized "take" of any marine mammal, unless subject to one of the Act's specific exemptions. Id. § 1372(a). Take is defined to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." Id. § 1362(13). Section 118 of the MMPA provides a detailed scheme governing a limited exemption for the incidental take of marine mammals during the course of commercial fishing operations, while at the same time ensuring that affected marine mammal stocks maintain their optimum sustainable populations. Id. § 1387(c), (f).

Accordingly, the MMPA requires NOAA Fisheries to develop a "take reduction plan" for each "strategic stock" of marine mammals that interacts with a fishery determined to cause either "frequent" or "occasional" mortality of serious injury to marine mammals. 16 U.S.C. § 1387(f)(1). Strategic stocks include those stocks: (1) which are listed as a threatened or endangered species under the ESA; (2) which are likely to be listed as a threatened species under the ESA in the foreseeable future; and (3) for which the level of human-caused mortality exceeds the "potential biological removal" ("PBR") level. Id. § 1362(19). PBR is a central concept in the MMPA, and is defined as the "maximum number of animals . . . that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." Id. § 1362(20).

Although section 118 of the MMPA authorizes limited takes of marine mammals by commercial fisheries, Congress intended that section 118 would also require "immediate action to protect . . . marine mammal stocks most affected by interactions with commercial fishing operations." S. REP. NO. 103-220, at 6 (1994) (emphasis added). The MMPA sets specific deadlines both for when take reduction plans are supposed to accomplish their goals, and by

which the plans themselves must be created. The "immediate goal" of a take reduction plan is to reduce, "within 6 months of its implementation," the incidental mortality and serious injury of marine mammals to below the PBR level. 16 U.S.C. § 1387(f)(2). The long-term goal of a take reduction plan must be to, within 5 years, reduce incidental mortality and serious injury "to insignificant levels approaching a zero mortality and serious injury rate." Id.

Take reduction plans are developed with the assistance of a "take reduction team," consisting of representatives from federal agencies, states with affected fisheries, academic organizations, environmental groups, and fishing groups. Id. § 1387(f)(6)(A)(i), (ii), (f)(6)(C). However, the final responsibility for issuing any take reduction plan lies with NOAA Fisheries. Id. § 1387(f)(7)(B). For each strategic stock where human-caused mortality or serious injury equals or exceeds the PBR level, the take reduction team "shall submit a draft" take reduction plan to NOAA Fisheries within 6 months after the team is established. Id. § 1387(f)(7)(A)(i). NOAA Fisheries must then, within 60 days after the team submits the draft, publish a proposed plan and implementing regulations in the Federal Register. Id. § 1387(f)(7)(B)(i). If the team fails to submit a draft plan within the required timeframe, NOAA Fisheries "shall, not later than 8 months after the establishment of the team," publish a proposed take reduction plan and implementing regulations.[2] Id. § 1387(f)(7)(B)(ii).

_____

[2] The MMPA actually establishes two very similar deadline schemes – a more stringent set of deadlines that applies to populations for which human-caused mortality and serious injury equals or exceeds PBR, as discussed above, and a slightly less demanding set of deadlines for those that do not exceed PBR. 16 U.S.C. § 1387(f)(7), (8). For strategic stocks whose mortality or serious injury is below the PBR level, the less stringent deadlines allow the take reduction team 11 months to issue a proposed rule and the agency 13 months to propose a rule if the team fails to act. Id. § 1387(f)(8)(A)(i), (B)(ii). However, the 60-day deadline for issuing a final take reduction plan and implementing regulations after the close of the comment period is identical for stocks above and below PBR. Id. § 1387(f)(7)(C), (8)(C).

For two of the whales at issue in this case, the North Atlantic right whale and the humpback

Once the proposed take reduction plan and implementing regulations have been published in the Federal Register, the agency may provide up to 90 days for public comment, and "[n]ot later than 60 days after the close of the comment period, [NOAA Fisheries] shall issue a final [TRP] and implementing regulations." 16 U.S.C. § 1387(f)(7)(C) (emphasis added). Further, as "necessary to meet the requirements" of the MMPA, NOAA Fisheries "shall" amend the take reduction plan and implementing regulations "in accordance with the procedures . . . for the issuance of such plans and regulations." Id. § 1387(f)(7)(F).

In sum, the MMPA allows – at most – a total of 13 months after NOAA Fisheries convenes a take reduction team to develop, propose, and finalize take reduction plan amendments. Id. § 1387(f)(7)(A), (B). In addition, and most pertinent to this litigation, the MMPA only allows NOAA Fisheries 60 days after the close of the public comment period on the proposed rule to issue a final take reduction plan and implementing regulations. Id. § 1387(f)(7)(C).

**B.    Endangered Species Act**

The Endangered Species Act ("ESA"), enacted in 1973, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). Finding "the value of endangered species [to be] 'incalculable,'" id. at 187, the Supreme Court has recognized Congress's "plain intent" in passing the statute "was to halt and reverse the trend toward extinction, whatever the cost." Babbitt v. Sweet Home Chapter of Comm. for a Great Ore., 515 U.S. 687, 699 (1995) (emphasis added). To

---

whale, human-caused mortality and serious injury exceeds PBR, so the more stringent 8 month deadline applies. Young Decl. ¶¶ 15, 16; id. § 1387(f)(7)(B)(ii). Although mortality and serious injury for the fin whale is below PBR, NOAA Fisheries has decided to issue a single take reduction plan for all three species, which must be issued in accordance with the more stringent deadlines. See 70 Fed. Reg. 35,894 (June 21, 2005) (proposed Take Reduction Plan rule covering North Atlantic right, humpback, and fin whales). Plaintiffs will refer to the applicable, more stringent deadline throughout this brief.

ensure endangered species are protected, the ESA strictly prohibits the "take" of any endangered species unless taken incidentally and with express authorization. 16 U.S.C. § 1538(a)(1). Take is defined, much like the MMPA, to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or [ ] attempt to engage in any such conduct." Id. § 1532(19).

   In addition, pursuant to section 7 of the ESA, each agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of the species." Id. § 1536(a)(2).[3] If the agency determines its action may jeopardize the continued existence of a species, the agency can specify a "reasonable and prudent alternative" that the agency deems necessary to avoid jeopardy. Id. § 1536(b)(4). The agency may then authorize the incidental take of an endangered species by issuing an "incidental take statement" specifying the extent of take allowed and incorporating the reasonable and prudent alternative as a condition to ensure no jeopardy occurs. Id. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1). Finally, if, during the course of the action, the amount of take exceeds the amount specified in the incidental take statement, the agency "must reinitiate consultation immediately." Id. § 402.14(i)(4).

## C.    The Three Endangered Whale Species

   The three endangered whale species at issue in this case are all endemic to the waters of the East Coast of the United States. The North Atlantic right whale (Eubalaena glacialis) is one of the rarest of all whales and, according to NOAA Fisheries, is "one of the most critically endangered species in the world," as approximately only 306 individual right whales survive today. 69 Fed. Reg. 30,857, 30,858 (June 1, 2004); Defs' Answer ¶ 25; NOAA Fisheries 2006

---

[3] The ESA defines "jeopardize" as engaging in an action that "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02.

Stock Assessment.[4] The remaining right whales are distributed along the East Coast, spending their winters in calving grounds as far south as Florida and their summers feeding and nursing in New England's waters north to Canada. Young Decl. ¶ 13.

The right whale has been listed as endangered since 1970, 35 Fed. Reg. 8491, 8495 (June 2, 1970), but the population has not recovered despite the legal protections it has been afforded. As noted above, NOAA Fisheries has concluded that the "loss of even a single individual may contribute to the extinction of the species." 69 Fed. Reg. at 30,858 (emphasis added). As such, the PBR level for the right whale is zero, meaning that if any right whales are removed from the stock, it will not be able to reach its optimum sustainable population as envisioned by the MMPA. Defs' Answer ¶ 25; 2006 Stock Assessment for the Western Atlantic Stock of the Northern Atlantic Right Whale at 9; see also 16 U.S.C. § 1362(20) (defining PBR). Nevertheless, at least six North Atlantic right whales have suffered serious injury or death due to entanglement since 2002, including one found dead just since Plaintiffs filed their Complaint in this case in February 2007. Young Decl. ¶ 12. Also since February 2007, another right whale was found newly entangled, with her condition judged by NOAA Fisheries-funded disentanglement experts to be "life threatening." Id. NOAA Fisheries has identified entanglement in commercial fishing gear as a major factor retarding growth and recovery of the North Atlantic right whale population. See Defs' Answer ¶ 26; 2006 Stock Assessment at 10. Because the right whale is listed as endangered and the level of human-caused mortality and injury exceeds PBR, the right whale is a "strategic stock" under the MMPA, and NOAA Fisheries must develop a TRP for this stock. 16 U.S.C. §§ 1362(19); 1387(f)(1).

---

[4] NOAA Fisheries' 2006 Atlantic Stock Assessment Reports may be found online at: http://www.nefsc.noaa.gov/nefsc/publications/tm/tm201/.

8

The humpback whale (<u>Megaptera novaeangliae</u>) is also an endangered species and has been listed since 1970. 35 Fed. Reg. at 8495. Humpback whales spend their summers feeding near the Northeast coast of the United States. Although most humpbacks migrate to the West Indies for mating and calving during the winter, numerous humpbacks have recently been sighted off the coast of the mid-Atlantic and Southeastern states. Young Decl. ¶ 15. NOAA Fisheries estimates the Gulf of Maine humpback whale population to be as low as 647 whales, and the agency has set the PBR for this humpback stock at only 1.3 whales per year. Defs' Answer ¶ 27; 2006 Stock Assessment for the Gulf of Maine Stock of Humpback Whales at 18. Annual serious injuries and mortalities of humpbacks are estimated at 3.0 animals per year, which is more than twice the PBR. Stock Assessment at 18. The 2006 Stock Assessment notes that anthropogenic impacts, including both ship strikes and fishing gear entanglements, may be slowing the humpback whale's recovery. <u>Id.</u> at 19; Defs' Answer ¶ 27. Because the humpback whale is listed as endangered and the level of human-caused mortality and injury exceeds PBR, the humpback whale is a "strategic stock" under the MMPA, and NOAA Fisheries must develop a take reduction plan for this species. 16 U.S.C. §§ 1387(f)(1); 1362(19).

The fin whale (<u>Balaenoptera physalus</u>), whose population ranges from Nova Scotia to Cape Hatteras along the East Coast of the United States, is also endangered and has been listed since 1970. 35 Fed. Reg. at 8495. NOAA Fisheries estimates its population to be approximately 2,362 whales. <u>See</u> Defs' Answer ¶ 29; 2006 Stock Assessment for the Western North Atlantic Stock of Fin Whales at 26. Although NOAA Fisheries estimates serious injury and mortality to be 1.8 animals per year, which is below the PBR of 4.7 for this species, NOAA Fisheries admits that the total level of human-caused serious injury or mortality is unknown. Defs' Answer ¶ 29; 2006

Stock Assessment at 18. NOAA Fisheries' proposed Recovery Plan for the fin whale recommends that further information be collected on the threat posed by fishery-related entanglement. Draft Recovery Plan for the Fin Whale, at IV-8.[5] Because the fin whale is listed as endangered, the fin whale is a "strategic stock" under the MMPA, and NOAA Fisheries must develop a take reduction plan for this species. 16 U.S.C. §§ 1362(19); 1387(f)(1).

**D.      The Atlantic Large Whale Take Reduction Plan**

NOAA Fisheries issued the original Take Reduction Plan to protect the North Atlantic right whale, the humpback whale, and the fin whale in 1997. 62 Fed. Reg. 39,157 (July 22, 1997). Importantly, development, and proposal of this original Plan proceeded in compliance with the MMPA's strict deadlines. 61 Fed. Reg. 40,819 (Aug. 6, 1996) (convening take reduction team); 62 Fed. Reg. 16,519 (April 7, 1997) (proposing Plan 8 months after take reduction team convened); 62 Fed. Reg. 39,157 (July 22, 1997) (issuing final Plan within 60 days after comment period closed). At the time NOAA Fisheries issued the original Take Reduction Plan, the agency also issued "interim" regulations implementing the plan. 62 Fed. Reg. at 39,157. Although the interim rule required substantial compliance with the final Take Reduction Plan within a few months, NOAA Fisheries termed the rules "interim" because the agency foresaw ongoing review by the take reduction team over the next several meetings. Id. at 39,161. NOAA Fisheries issued final regulations in February 1999, incorporating the interim rule with only minimal changes. 64 Fed. Reg. 7529 (Feb. 16, 1999).

Also, in 1996, NOAA Fisheries completed "section 7 consultation" pursuant to the ESA to determine whether the agency's authorization of the American lobster trap/pot fishery and

---

[5]    The   Draft   Recovery   Plan   for   the   fin   whale   is   available   at: http://www.nmfs.noaa.gov/pr/pdfs/recovery/draft_finwhale.pdf.

Northeast multispecies gillnet fisheries would "jeopardize" the continued existence of the North Atlantic right whale. 16 U.S.C. § 1536(a)(2); 70 Fed. Reg. at 35,895. NOAA Fisheries determined that authorizing these fisheries would jeopardize the whale's continued existence, but also concluded that measures adopted under the Take Reduction Plan would ensure jeopardy was avoided. 70 Fed. Reg. at 35,895. As such, the Atlantic Large Whale Take Reduction Plan was adopted as an ESA-mandated "reasonable and prudent alternative" to avoid jeopardy, essentially incorporating the MMPA-mandated measures into the ESA's requirements. [6] Id.

Despite issuance of the Take Reduction Plan, whales continue to sustain injury and death from commercial fishing gear entanglement. In July of 2002, a female right whale (right whale #3107) was discovered entangled in fishing gear, which resulted in her death later that year. See 70 Fed. Reg. at 35,895. After examining the gear recovered from right whale #3107, NOAA Fisheries concluded that the gear was "consistent" with the type of gear expressly approved of by the Take Reduction Plan.[7] Id. at 35,896. Based on this incident, it became clear that the Take Reduction Plan was failing to sufficiently minimize entanglements as required by the MMPA and thus required substantial amendment. See Defs' Answer ¶¶ 31–32 (admitting failure of the plan in 2002 and that revision was required). Further, because the Take Reduction Plan had also been adopted as a mandatory measure to avoid "jeopardy" to the North Atlantic right whale under the ESA, the death of right whale #3107 also triggered NOAA Fisheries' duty to reinitiate

---

[6] NOAA Fisheries subsequently adopted the Take Reduction Plan as a reasonable and prudent alternative to avoid jeopardy to right whales in the gillnet component of the monkfish and dogfish fisheries as well. 70 Fed. Reg. at 35,895.

[7] Specifically, NMFS determined that the gear contained a weak link, a type of gear modification required by the Take Reduction Plan that allows nets to break when sufficient pressure is applied, like the pressure of an entangled whale. 70 Fed. Reg. at 35,896. This type of weak link had the same "breaking strength" as is currently required by the Take Reduction Plan for some lobster fishing areas. Id.

consultation on the American lobster trap/pot fishery and Northeast multispecies gillnet fisheries under the ESA. 70 Fed. Reg. at 35,895; 50 C.F.R. § 402.02(i)(4).

NOAA Fisheries did not convene the take reduction team to assist in developing amendments to the Take Reduction Plan until April 28, 2003. 70 Fed. Reg. at 35,896. The team was unable to reach consensus. Although the MMPA imposes a mandatory duty for NOAA Fisheries to propose Take Reduction Plan amendments within 8 months of establishing a take reduction team regardless of whether the team issues recommendations, 16 U.S.C. § 1387(f)(7)(B)(ii), NOAA Fisheries failed to propose an amended Plan until June 21, 2005, a full 18 months late on this statutory deadline alone. 70 Fed. Reg. at 35,894. The comment period on the proposed amendments closed on August 22, 2005. 70 Fed. Reg. 40,301 (July 13, 2005). Despite the MMPA's requirement that "[n]ot later than 60 days after the close of the comment period . . . the Secretary shall issue a final take reduction plan and implementing regulations," 16 U.S.C. § 1387(f)(7)(C) (emphasis added), NOAA Fisheries still has failed to finalize the plan amendments 19 months after the last statutory deadline.

On February 12, 2007, after waiting more than 18 months for NOAA Fisheries to issue the final amended Take Reduction Plan and implementing regulations, Plaintiffs filed this suit.[8] Since

---

[8] Plaintiffs, who have members who regularly look for, observe, study, and appreciate North Atlantic right whales, humpback whales, and fin whales in their natural habitat, and whose ability to engage in these activities is compromised by the risk of whales suffering injury and death by entanglement in commercial fishing gear, plainly have standing to bring this suit. See Declarations of Sharon Young ¶¶ 3, 19, 20, John Phillips ¶¶ 3–5. See, e.g., Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. 167, 183 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity") (citations omitted); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562–63 (1992) ("Of course, the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purposes of standing"); Japan Whaling Assn v. Am. Cetacean Soc., 478 U.S. 221, 230, n.4 (1986) (finding that plaintiffs who engaged in "whale watching and studying" had standing to challenge activity that killed whales).

the death of right whale #3107 that prompted NOAA Fisheries to determine that the Take Reduction Plan had failed, at least 6 right whales, 13 humpback whales, and 3 fin whales were seriously injured or killed as a result of entanglement in commercial fishing gear. Young Decl. ¶¶ 12, 15, 16. Despite clear deadlines requiring "immediate" action be taken to reduce the serious injury and death of marine mammals from entanglement to levels below PBR, the agency still has failed to issue final protective regulations. 16 U.S.C. § 1387(f)(7).

## ARGUMENT

The APA entitles "a person suffering legal wrong because of agency action . . . judicial review thereof." 5 U.S.C. § 702. The Act defines "agency action" to include a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13) (emphasis added). Failure to act includes any "discrete agency action that it is required to take," including "when an agency is compelled by law to act within a certain time period." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64–65 (2004) (emphasis in original). In such circumstances, "a reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (emphasis added).

Defendants have violated the MMPA by failing to issue a final amended Take Reduction Plan and implementing regulations within the statutory deadline. This clearly constitutes a "failure to act" and "unlawfully withheld" agency action under the APA. 5 U.S.C. §§ 551(13); 706(1). For the reasons set forth below, Plaintiffs request that this Court compel NOAA Fisheries to issue a final amended Take Reduction Plan and implementing regulations within 30 days.

I.    **Defendants Are Violating the MMPA and Should Be Compelled to Comply with the Statute Within 30 Days.**

A.    **Defendants Violated the MMPA by Failing To Issue a Final Amended Take Reduction Plan by the Statutory Deadline.**

There is no question that NOAA Fisheries has failed to comply with its non-discretionary duty to issue an amended Take Reduction Plan and implementing regulations under the MMPA. Indeed, Defendants admit revision of the plan was required in their Answer to Plaintiffs' Complaint. Defs' Answer ¶¶ 31–32. The MMPA sets a clear deadline, requiring that NOAA Fisheries, "[n]ot later than <u>60 days</u> after the close of the comment period [for the proposed amended plan and implementing regulations], <u>shall issue</u> a final take reduction plan and implementing regulations." 16 U.S.C. § 1387(f)(7)(C) (emphases added). Now, 19 months after that deadline expired, NOAA Fisheries' failure to issue the amended Take Reduction Plan continues to put the highly endangered North Atlantic right whale, humpback whale, and fin whale in peril of extinction.

By failing to act within the statutory deadline, NOAA Fisheries has violated the clear statutory command of the MMPA and has unlawfully withheld the issuance a non-discretionary rule. Congress simply could not have been any clearer about its intent in expediting the take reduction plan process in order to protect marine mammals from being killed or seriously injured in commercial fishing gear. <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 175 (1997) (when statute "uses the imperative 'shall,'" any contention that provision is "discretionary would fly in the face of its text"); <u>United States v. Monsanto</u>, 491 U.S. 600, 607 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); <u>Pierce v. Underwood</u>, 487 U.S. 552, 569–70

14

(1988) (Congress's use of "shall" in a housing subsidy statute constitutes "mandatory language").

The APA mandates that "a reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Accordingly, if a plaintiff has standing and "prevails on its APA claim, it is entitled to relief under that statute." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (emphasis added); United States v. Oakland Cannabis Buyers' Co-op., 532 U.S. 483, 497–98 (2001) (in issuing a remedy, a court's only choice "is simply whether a particular means of enforcing the statute should be chosen over another permissible means, . . . not whether enforcement is preferable to no enforcement"). As such, the only remaining question in this case is the nature of the remedy for Defendants' violation – i.e., whether Defendants should be ordered to immediately comply with the statute or be permitted additional delay.

**B.    Because Congress Has Already Determined the Agencies' Order of Priorities, the Court Should Compel Defendants to Issue a Final Amended Take Reduction Plan Immediately.**

In determining the appropriate remedy for an unlawfully withheld or unreasonably delayed agency action, courts in this Circuit ordinarily look to the equitable factors ("TRAC" factors) provided in Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) (listing 6 equitable factors, including reasonableness and consequences of delay, as well as consideration of the agency's priorities). The primary purpose of the TRAC analysis is to provide courts with a framework for resolving competing agency priorities in the face of limited resources. See In re Barr Lab., Inc., 930 F.2d 72, 76 (D.C. Cir. 1991) (refusing to engage in a "reordering of agency priorities" without a compelling reason); Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1101 (D.C. Cir. 2003) (highlighting "the importance of

15

competing priorities" in the <u>TRAC</u> factors).

In this case, however, the agency's priorities have <u>already</u> been determined by Congress in the plain language of the MMPA, and the balance of equities has <u>already</u> been struck in favor of endangered species conservation under both the MMPA and ESA. <u>Cf.</u> <u>Biodiversity Legal Found.</u> <u>v. Badgley</u>, 309 F.3d 1166, 1178 (9th Cir. 2002) (refusing to apply <u>TRAC</u> factors to agency action unlawfully withheld beyond ESA deadline because Congress had already weighed the equities and struck the balance in favor of species conservation). Therefore, no further equitable balancing under <u>TRAC</u> is required.

Although it is clear that a judge sitting as a court of equity "is not mechanically obligated to grant an injunction for every violation of the law," it is equally clear that "Congress may intervene and guide or control the exercise of the court's discretion." <u>Weinberger v. Romero-</u> <u>Barcelo</u>, 456 U.S. 305, 313 (1982). When Congress "has decided the order of priorities in a given area, it is . . . for the courts to enforce them," <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 194 (1978) ("<u>TVA v. Hill</u>"), and courts in equity cannot "reject the balance that Congress has struck in a statute." <u>Oakland Cannabis</u>, 532 U.S. at 497.

However, Congress explicitly considered the agency's "order of priorities" in developing take reduction plans and made a conscious decision to include within the MMPA a specific directive giving top priority to exactly the type of take reduction plan at issue in this case. Accordingly, in addition to mandating that a final take reduction plan and regulation must be issued "[n]ot later than <u>60 days</u> after the close of the comment period," 16 U.S.C. § 1387(f)(7) – a very strict mandate – Congress also stated that, in issuing take reduction plans, "the Secretary <u>shall</u> give <u>highest priority</u> to . . . species or stocks whose level of incidental mortality and serious

16

injury exceeds [PBR], those that have a small population size, and those which are declining most rapidly." 16 U.S.C. § 1387(f)(3) (emphasis added). As noted above, the three whale species at issue in the Atlantic Large Whale Take Reduction Plan are all highly endangered – one of which NOAA Fisheries has referred to as "one of the most critically endangered species in the world." 69 Fed. Reg. 30,857, 30,858 (July 1, 2004). Furthermore, takes of both North Atlantic right whales and humpback whales are above PBR. Young Decl. ¶ 15, 16. As such, the still missing take reduction plan at issue in this case is exactly the type of action Congress decided to prioritize in section 1387(f)(3) of the MMPA. See also S. REP. NO. 103-220, at 6 (1994) (noting "the need for immediate action to protect . . . marine mammal stocks most affected by interactions with commercial fishing operations") (emphasis added).

The conclusion that Congress has already determined the agency's order of priorities, and hence there is no cause for the Court to second-guess that decision under TRAC, is reinforced by the Endangered Species Act, which is intrinsically tied to the MMPA scheme at issue in this case, and which provides further direction concerning the agency's priorities. In TVA v. Hill, the Supreme Court looked to the purpose and language of the ESA and determined that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer," because the ESA made "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." 437 U.S. at 173, 194; see also Weinberger, 456 U.S. at 314 (reiterating that equitable factors have no role in an ESA claim); Nat'l Wildlife Fed'n v. Burlington Nat'l R.R., 23 F.3d 1508, 1511 (9th Cir. 1994) (in the ESA "Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests").

17

Congress's decision to afford endangered species the highest priority is significant in this case, since the take reduction plan mandated and prioritized by Congress in the MMPA is designed to protect whale species listed as endangered under the ESA from serious injury and death by entanglement. Both the MMPA and the ESA expressly prohibit the "take" of endangered marine mammals. 16 U.S.C. § 1538(a)(1)(B). Furthermore, NOAA Fisheries determined it had to amend the take reduction plan because the plan failed to meet the mandates of both the MMPA and ESA. See 70 Fed. Reg. at 35,896 (after the death of right whale #3107, agency determined Take Reduction Plan was not effective at avoiding jeopardy under the ESA, and "[a]s required," the agency initiated amendment).

In short, when Congress, as it has done in the MMPA and the ESA, makes "clear that the balance [of equities] has been struck in favor" of affording immediate protection to endangered marine mammals, a court should not "pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.'" TVA v. Hill, 437 U.S. at 195.  In deference to Congress's clear statement of priorities in this matter, the Court should compel NOAA Fisheries to issue a final amended take reduction plan immediately, and without any further equitable balancing under TRAC.[9]

---

[9] At least one Circuit, the Tenth, has concluded that the APA itself eliminates a court's equitable discretion in fashioning a remedy, regardless of the underlying substantive statute at issue. Because the APA directs that a "reviewing court shall . . . compel agency action unlawfully withheld," the Tenth Circuit held the court was required to automatically issue an order compelling compliance. Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999); 5 U.S.C. § 706(1) (emphasis added). Noting that Congress "may restrict the court's jurisdiction in equity by making injunctive relief mandatory for a violation," the Tenth Circuit held that Congress did just that when it used the word "shall" in the APA. Id. at 1187. Thus, the court concluded, when an agency withholds an action beyond a deadline, "a reviewing court must compel the action unlawfully withheld" because "to hold otherwise would be an affront to our tradition of legislative supremacy and constitutionally separated powers." Id. at 1190.

**C.**     **In the Alternative, This Court Should Compel Defendants to Issue a Final Amended Take Reduction Plan Under the <u>TRAC</u> Factors.**

Even if the Court were inclined to apply the <u>TRAC</u> "unreasonable delay" factors to this case, the issuance of immediate relief still is warranted. 750 F.2d at 80. The first of the <u>TRAC</u> factors requires that a "rule of reason" must govern the time agencies take to make decisions. <u>Id.</u> The second, and most important factor for this case, is whether there is a statutory "timetable or other indication of speed with which [Congress] expects the agency to proceed." <u>Id.</u> Third, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." <u>Id.</u> Fourth, the court should consider the effect of compelling the agency action "on agency activities of a higher or competing priority." <u>Id.</u> Fifth, the court should consider "the nature and extent of the interests prejudiced" by the agency's failure to act. <u>Id.</u> Finally, the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." <u>Id.</u> (internal citations omitted); <u>see</u> <u>Cobell v. Norton</u>, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (condensing the six-factor <u>TRAC</u> test to four factors, including ascertaining the length of delay, determining reasonableness based on the "context of the statute," examining the consequences, and considering agency priorities and convenience).

Applying the <u>TRAC</u> factors here, it is clear that the equities weigh strongly in favor of compelling final agency action in an expeditious timeframe. For these reasons, and especially in light of the egregious 19-month delay beyond the clear 60-day deadline set by Congress to protect marine mammals, this Court should compel the agency to act.

**1. The MMPA Establishes Clear Statutory Deadlines Requiring the Issuance of a Final Take Reduction Plan Within 60 Days of the Close of the Comment Period.**

Applying the first two factors of <u>TRAC</u> test, Congress has certainly "indicat[ed the] speed with which it expects the agency to proceed." 750 F.2d at 80. As discussed above, the MMPA sets a strict deadline, requiring NOAA Fisheries to issue a final amended Take Reduction Plan and implementing regulations "within 60 days" of the close of the comment period on the proposed rule. 16 U.S.C. § 1387(f)(7)(C). The agency missed that deadline 19 months ago. 70 Fed. Reg. 40,301 (July 13, 2005) (comment period for the proposed Take Reduction Plan closed August 22, 2005, thereby requiring a final rule to publish no later than October 21, 2005). Defendants' complete failure to meet the MMPA's deadline is unlawful and thus patently violates any "rule of reason" under which the agency must act. <u>TRAC</u>, 750 F.2d at 80; <u>In re Barr Lab. Inc.</u>, 930 F.2d 72, 75 (D.C. Cir. 1991).

Not only have Defendants failed to meet a mandatory deadline, Defendants have now exceeded the amount of time allotted by the statute – 60 days to issue a final rule – by 10 times. <u>In re Barr Lab. Inc.</u>, 930 F.2d at 74 (finding delay ranging between double and quadruple the time allotted to be "severe").[10] Moreover, this delay in meeting the final statutory deadline in the amended TRP process – 19 months – is longer than the 13-month timeframe Congress envisioned for the <u>entire</u> process of to developing and implementing a Take Reduction Plan. In sum, Congress has set a timeframe under which Defendants must act, which Defendants have egregiously missed, and they cannot now argue that ignoring this deadline constitutes a "rule of

---

[10] It is worth noting that in addition to the 19-month delay Plaintiffs' legal claim focuses on here, NOAA Fisheries previously missed the MMPA's deadline to issue a proposed amended Plan within 8 months, instead taking 18 months. <u>See</u> 16 U.S.C. § 1387(f)(7)(B)(ii); 70 Fed. Reg. at 35,896 (take reduction team convened April 28, 2003); 70 Fed. Reg. at 35,894 (NOAA Fisheries proposed amended Plan on June 21, 2005).

20

reason" under <u>TRAC</u>. 750 F.2d at 80.

**2.    The Court Should Compel the Issuance of a Final Take Reduction Plan in Light of Severe Environmental Consequences of Defendants' Failure to Comply with the Statutory Deadline.**

Under the third and fifth <u>TRAC</u> factors, the Court must consider the nature and consequences of the agency's failure to issue the final amended Take Reduction Plan and implementing regulations. <u>Cobell</u>, 240 F.3d at 1096. The court is instructed to "estimate the extent to which delay may be undermining the statutory scheme . . . by frustrating the statutory goal." <u>Cutler v. Hayes</u>, 818 F.2d 879, 897–98 (D.C. Cir. 1987). Here, the agency's continued foot-dragging allows commercial fishing gear to imperil the continued existence the North Atlantic right whale, stymie the recovery of the humpback whale, and entangle, injure, and kill all three whale species throughout their ranges along the Eastern seaboard of the United States – the very problem section 118 of the MMPA was enacted to resolve. <u>See</u> Young Decl. ¶¶ 12, 15, 16 (listing 6 right whales, 13 humpback whales, and 3 fin whales seriously injured or killed as a result of entanglement between June 2002 when the original plan failed and February 2007 when Plaintiffs filed their Complaint); S. REP. NO. 103-220, at 6 (1994).

Each month of delay further threatens the three already-endangered species. Even in the time between the filing of Plaintiffs' Complaint and the filing of <u>this motion</u> for summary judgment, 2 entangled North Atlantic right whales were found, one dead after being seen entangled since 2002 and another whose condition was judged by scientists attempting to disentangle her as "life threatening." <u>See</u> Young Decl. ¶ 12. Given Defendants' own statement that the death of even a <u>single</u> female from the roughly 306-member North Atlantic right whale population "may contribute to the extinction of the species," 69 Fed. Reg. at 30,858, the agency

may be "losing its ability to effectively regulate at all." See Cutler v. Hayes, 818 F.2d at 897–98.

Further, as noted in TRAC, "[d]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." 750 F.2d at 80. As the D.C. Circuit has recognized, protection of human health and welfare includes the protection of the environment. See In re Bluewater Network, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (ordering the agency to act by granting mandamus petition, when the delay "implicate[d] important environmental concerns"); Envtl. Defense Fund v. Ruckelshaus, 439 F.2d 584, 597 (D.C. Cir. 1971) (protection of the public interest "includes fish and wildlife"). Here, the continued existence of three endangered whale species is at stake while the agency continues to violate its duty to set protective measures.

### 3. Protecting Critically Endangered Marine Mammals, like the North Atlantic Right Whale, Should Be Defendants' Top Priority.

Finally, applying the fourth and sixth TRAC factors, the Court must consider the effect of compelling agency action "on agency activities of higher or competing priority." TRAC, 750 F.2d at 80 (noting that the court need not "find any impropriety lurking behind agency lassitude" to compel agency action). As discussed above, the agency is obligated under both the MMPA and ESA to protect the species at issue in this case and to make their conservation a top priority. See 16 U.S.C § 1387(f)(3); TVA v. Hill, 437 U.S. at 180.

NOAA Fisheries itself has referred to the North Atlantic right whale as "one of the most critically endangered species in the world," such that the "loss of even a single individual may contribute to the extinction of the species." 69 Fed. Reg. 30,857, 30,858 (July 1, 2004). In addition, the population of humpback whales has declined to roughly 647 individuals, and incidental mortality and serious injury exceeds PBR for both humpback and right whale stocks.

Defs' Answer ¶ 25, 27; Young Decl. ¶¶ 14, 15. In light of these facts and the priorities set by the MMPA and ESA, the agency has not suggested, nor could it suggest, that other take reduction plans or other conservation measures take precedence over the Take Reduction Plan. See Mead Corp. v. Browner, 100 F.3d 152, 157 (D.C. Cir. 1996) (agency decision to put low-risk hazardous waste sites on list "would make a hash of Congress's intended prioritization"); Oil, Chem. and Atomic Workers Int'l Union v. Zegeer, 768 F.2d 1480, 1487 (D.C. Cir. 1985) (when Congress identifies its "first priority and concern," it "could not have intended to give [the agency] unbridled discretion to withhold or delay development and promulgation of [such rules]").

In summary, if the Court elects to apply the TRAC factors here, an order compelling NOAA Fisheries to issue a final Take Reduction Plan and implementing regulations – an action the agency has failed to take for 19 months past the statutory deadline – is clearly warranted. 5 U.S.C. § 706(1); Am. Bioscience Inc., 269 F.3d at 1084 (if a plaintiff has standing and "prevails on it APA claim, it is entitled to relief under that statute"). Given the 19 months that have passed since Defendants missed the MMPA's 60-day deadline, Plaintiffs request that the Court compel the agency to issue a final amended Take Reduction Plan and implementing regulations within 30 days. See In re Am. Rivers and Idaho Rivers United, 372 F.3d 413, 420 (D.C. Cir. 2004) (requiring agency to issue a "judicially reviewable response" to petition "within 45 days" of the issuance of the court's opinion).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs are entitled to summary judgment in this case, and the Court should compel Defendants to issue a final amended Atlantic Large Whale Take Reduction Plan and implementing regulations within 30 days of its decision. 5 U.S.C. § 706(1).

Respectfully submitted,

  /s/ Sarah Uhlemann
Sarah Uhlemann
DC Bar No. 501328
Jonathan Lovvorn
DC Bar No. 461163
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20037

*Attorneys for Plaintiff The Humane Society of the United States*

  /s/ Sierra B. Weaver
Sierra B. Weaver
DC Bar No. 488560
Coby Dolan
DC Bar No. 483237
The Ocean Conservancy
2029 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiff The Ocean Conservancy*

May 23, 2007

24

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE HUMANE SOCIETY OF THE               )     Civ. No. 07-0333 (ESH)
UNITED STATES; and THE OCEAN            )
CONSERVANCY,                            )
                                        )
        Plaintiffs,                     )
                                        )
            v.                          )
                                        )
CARLOS M. GUTIERREZ, et al.,            )
                                        )
        Defendants.                     )
_____)

## STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7(h), Plaintiffs submit the following statement of material facts for which Plaintiffs contend there is no genuine issue:

1.      The North Atlantic right whale, humpback whale, and fin whale are all listed as endangered species pursuant to the Endangered Species Act. 35 Fed. Reg. 8491, 8495 (June 2, 1970).

2.      Since at least November of 2002, when right whale #3107 was discovered dead after being disentangled from commercial fishing gear in July of 2002, Defendants have been aware that the Atlantic Large Whale Take Reduction Plan ("Take Reduction Plan") required revision. 70 Fed. Reg. 35,894, 35,896 (June 21, 2005)

3.      NOAA Fisheries convened the Atlantic Large Whale Take Reduction Team on April 18, 2003 to consider amendments to the existing Take Reduction Plan. Id.

4.      NOAA Fisheries issued a proposed amended Take Reduction Plan and implementing regulations on June 21, 2005. Id.

5.      The comment period on the proposed Take Reduction Plan closed on August 22,

2005. 70 Fed. Reg. 40,301 (July 13, 2005).

6.    Sixty-days after August 22, 2005 is October 21, 2005.

7.    As of the date of Plaintiffs' Motion for Summary Judgment, NOAA Fisheries has

not yet published a final, amended Atlantic Large Whale Take Reduction Plan and implementing

regulations.

8.    As of May 21, 2005, nineteen months elapsed since October 21, 2005.

Respectfully submitted,

  /s/ Sarah Uhlemann____
Sarah Uhlemann
DC Bar No. 501328
Jonathan Lovvorn
DC Bar No. 461163
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20037

*Attorneys for Plaintiff The Humane Society
of the United States*

  /s/ Sierra B. Weaver____
Sierra B. Weaver
DC Bar No. 488560
Coby Dolan
DC Bar No. 483237
The Ocean Conservancy
2029 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiff The Ocean
Conservancy*

May 23, 2007

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
THE HUMANE SOCIETY OF THE          )          Civ. No. 07-0333 (ESH)
UNITED STATES; and THE OCEAN       )
CONSERVANCY,                                   )
                                                      )
                  Plaintiffs,                        )
                                                      )
            v.                                         )
                                                      )
CARLOS M. GUTIERREZ, et al.,          )
                                                      )
                  Defendants.                       )
_____)

I, Sharon Young, declare as follows:

1.       I have lived in Sagamore Beach, Massachusetts, for more than fifteen

years, and I am a member of, and the Marine Issues Field Director for, The Humane

Society of the United States ("The HSUS"). I have been an employee and member of The

HSUS since 1992.

2.       I have devoted a significant amount of my professional attention and

personal concern to the plight of marine mammal species, and particularly the plight of

endangered whales. Prior to my employment with The HSUS, I conducted research on

feeding and foraging ecology of large baleen whales, like North Atlantic right whales,

while at the Station Recherche des Isles Mingan, in Quebec, Canada and Plymouth

Marine Mammal Research Center. I am also still Adjunct Faculty in the Tufts University

Animals and Public Policy graduate school, supervising independent study projects for

their graduate students interested in marine policy. And I was, for one semester, an

instructor in the Boston University Marine Program in Woods Hole.

3.      I enjoy studying, observing, and appreciating whales in their natural habitat. I regularly take boat trips to look for whales, including North Atlantic right whales, humpback whales, and fin whales. I have also seen right whales and humpback whales from land from the beach in Provincetown, Massachusetts and from Virginia Beach, Virginia. I work occasionally as a naturalist on whale watching boats and regularly go out on these boats to see whales. In the past twenty-two years, I have seen right, fin, and humpback whales on numerous occasions and I will continue to look for, observe, and appreciate these whales as long as the species remain extant, but, as discussed below, that becomes ever more difficult as populations diminish.

4.      The HSUS, a non-profit organization headquartered in Washington, D.C., is the largest animal protection organization in the United States, with nearly ten million members and constituents. The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands, and fostering the humane treatment of all animals. In furtherance of its goals and objectives, The HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals.

5.      Prior to my employment by The HSUS, I was involved in field research studying feeding and foraging behavior of large baleen whales. I am a co-author on a number of scientific publications that focus on North Atlantic right whales, humpback, and fin whales.[1] I have also worked on commercial whale watching boats in

---

[1] *See e.g.*, Clapham P.J., S.B. Young and R.L. Brownell. 1999 *Baleen Whales: Conservation Issues and the Status of the Most Endangered Populations.* Mammal Review: 29 (1) pp. 35-60; Payne, P.M., D.N. Wiley, S.B. Young, S. Pittman, and P.J. Clapham. 1990 *Recent Fluctuations in the Abundance of Baleen Whales in the Southern Gulf of Maine in Relation to Changes in Selected Prey.* Fisheries Bulletin, U.S. 88:687-

Massachusetts where I was able to see and study right, fin, and humpback whales and their behavior. This position afforded me an opportunity to educate the public about the conservation issues facing right whales and other endangered cetaceans. While working aboard whale watch vessels, I have observed numerous whales of all three species entangled in fishing gear. Some of these whales were severely entangled, and I have had to explain to passengers on these whale watching trips how the animals became entangled and injured and what fate might befall the animals as a result of the injury they sustained; something that was upsetting both to me and the passengers. I have also witnessed dead, entangled whales. These events had a profound effect on me and strengthened my resolve to continue studying, and advocating on behalf of, endangered marine mammals, including right, humpback, and fin whales.

6.       I regularly provide comments on behalf of The HSUS on all National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("NOAA Fisheries"), federal, and state agency actions that affect right, humpback, and fin whales, including the annual List of Fisheries, stock assessments, proposed rulemakings, issuance of scientific permits to study these whales, and other published notices. I have also attended meetings of the Recovery Plan Implementation Teams.

7.       Additionally, in light of my professional experience and knowledge of whales, in 1996 I was appointed by NOAA Fisheries to participate in the Atlantic Large

---

696; Young, S. *Reauthorization of the Marine Mammal Protection Act: The Impact on Fisheries and Endangered Marine Mammals.* Endangered Species Update 10 (#11-12):13-14 (1993); and Wiley, D.N. and S.B. Young. 1998 *The influence on asymmetrical body coloration on the feeding behaviour of the fin whale* (Balaenoptera physalus). The Twenty-fourth Annual Meeting of the Animal Behaviour Society.  Missoula, Mt. Abstract. p. 94.

Whale Take Reduction Team ("ALWTRT"), a congressionally-mandated stakeholder group comprised of scientists, fishermen, and conservationists charged with recommending strategies to reduce the mortality and serious injury of endangered large whales resulting from entanglement in commercial fishing gear. The Team focuses on reducing entanglement risk to endangered right, humpback, and fin whales, as well as minke whales.

8.      From 1996 to 1997, I participated in the ALWTRT's efforts to assist NOAA Fisheries in developing the original Atlantic Large Whale Take Reduction Plan ("ALWTRP"). The ALWTRT was not able to reach consensus, but in 1997, did submit a draft Take Reduction Plan for NOAA Fisheries that contained a series of recommendations.

9.      I have continued to attend regular meetings of the ALWTRT as NOAA Fisheries has requested the Team's assistance in reviewing and amending the ALWTRP. I attended the April 28, 2003 meeting when NOAA Fisheries announced their intention to amend the current ALWTRP because the plan was failing to meet the requirements of the Marine Mammal Protection Act ("MMPA"). As explained in the meeting, right whale #3107 had been discovered entangled in July of 2002. Although she was subsequently freed, she was discovered dead in November 2002. NOAA Fisheries determined that the gear recovered from right whale #3107 was consistent with gear used by the lobster fishery, i.e., TRP-compliant gear.[2] Accordingly, NOAA Fisheries determined that the ALWTRP and the "reasonable prudent alternatives" contained in that plan were not effective at protecting right whales from jeopardy. I have attended each subsequent

---

[2] 70 Fed. Reg. 35,894, 35,896 (June 21, 2005) (proposed ALWTRP rule).

ALWTRT meeting and have participated in TRT discussions involving recommendations for reducing risk, some of which formed the basis of the June 2005 proposed ALWTRP amendments.

10.    It has been extremely frustrating for me to see that, since the 2002 death of right whale #3107, NOAA Fisheries has delayed issuing a final amended ALWTRP. Although in June of 2005, the agency finally issued a proposed ALWTRP and implementing regulations, to this date, the agency has failed to finalize any of the proposed risk reduction measures.

11.    Since NOAA Fisheries determined the ALWTRP had failed following the death of right whale #3107, several more endangered whales have suffered serious injury or death from entanglement.

12.    For example, since November 2002, when right whale #3107 was discovered dead due to entanglement in TRP-compliant gear, at least six North Atlantic right whales have suffered serious injury or death due to entanglement, and since February 12, 2007, the date the Complaint in this case was filed, one right whale was found dead after being entangled since 2002 and another was found newly entangled, with her condition judged by NOAA Fisheries-funded disentanglement experts to be "life threatening."[3] An injury is deemed "serious" if the entangled whale shows signs that mortality is likely.

13.    The North Atlantic right whale (*Eubalaena glacialis*) is the most endangered large whale on the East coast of the United States. Only approximately 325

---

[3] Atlantic Large Whale Disentanglement Network, Entanglement/Disentanglement Updates 2002-2007 available at:
http://www.coastalstudies.org/_entanglementupdate/entanglement~update.htm.

individual right whales survive today.[4] Right whales are "baleen" whales, which means they have a special filter-like adaptation in their jaw bones designed for filter-feeding. As they feed, swimming through the water with their mouths open, lines used in commercial fisheries may become caught in their baleen. Right whales can grow to be 50 feet long, with their heads can constituting up to one-quarter of their body length. The remaining right whales are distributed along the East Coast, spending their winters in calving grounds as far south as Florida and their summers feeding and nursing in New England's waters north to Canada.[5]

14.    To my continued concern, the North Atlantic right whale population has continued to decline since I began studying the species in 1984. According to a number of national and international experts who have presented results at meetings I have attended, the proximal cause of the decline of the species is anthropogenic – that is, the death of these animals is a result of collisions with commercial vessels and fishing gear entanglement. Current research indicates that recent increases in right whale births are still too small to compensate for the number of whales that are dying in collisions or as a result of entanglement in fishing gear.[6] If the two causes of mortality can be addressed with corrective action by NOAA Fisheries, the species is likely to slowly recover in spite of its low fecundity. Further, NOAA Fisheries has set the Potential Biological Removal

---

[4] 2006 NOAA Fisheries Western Atlantic Stock Assessment for the Northern Right Whale at 1.
[5] Id.
[6] Kraus, S. M. Brown, H. Caswell, C. Clark, M. Fujiwara, P. Hamilton, R. Kenney, A. Knowlton, S. Landry, C.Mayo, W. McLellan, M. Moore, D. Nowacek, D.A. Pabst, A. Read and R. Rolland. 2005. North Atlantic Right Whales in Crisis. Science. V. 309. 22 July 2005. p. 561.

level ("PBR") at zero, meaning that no right whales may be removed from the stock or the stock may not reach its optimum sustainable population level.[7]

15.    Further, since November of 2002, at least 13 humpback whales have suffered serious injury or death due to entanglement. Since 2005, the date by which NOAA Fisheries should have released final take reduction rules, NOAA Fisheries-funded disentanglement experts have noted five humpback whales that they commented had "poor prognosis for survival," or were described as "emaciated," "anchored in gear" with appendages pinned and never re-sighted, "seriously injured," or had necrotic flesh or encrusting body parasites that compromised the animals' health.[8] Humpback whales (*Megaptera novaeangliae*) spend their summers feeding near the Northeast coast of the United States, including the Gulf of Maine where they are favorite target of whale watch boats,[9] because of their acrobatic out-of-water "breaching" and tail displays. Although most humpbacks migrate to the West Indies for mating and calving during the winter, numerous, mostly juvenile, humpbacks have recently been sighted off the coast of the mid-Atlantic and Southeastern states. The whales are also well-known for their "songs," or vocalizations, that can last up to twenty minutes, and are believed to be a part of mating behavior. NOAA Fisheries has stated in their stock assessment that "high levels of mortality among humpback whales off the U.S. mid-Atlantic states is cause for considerable concern,"[10] and set the Potential Biological Removal level for the Gulf of

---

[7]  2006 Western Atlantic Stock of the Northern Right Whale Stock Assessment at 9.
[8] Atlantic Large Whale Disentanglement Network. Entanglement/Disentanglement Update 2002-2007. Available at:
http://www.coastalstudies.org/_entanglementupdate/entanglement~update.htm.
[9] 2006 Gulf of Maine Stock Humpback Whale Stock Assessment at 19.
[10] Waring, G, E. Josephson, C. Fairfield, K. Maze-Foley (eds); 2006 U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments.

Maine stock at 1.3 whales per year.[11] However, annual serious injuries and mortalities are estimated at 3.0 animals per year. <u>Id.</u> In addition, there have been several mysterious mass die-offs in the population that may be a result of harmful algal blooms in their northeast feeding area, the most recent in 2006.

16.    Since November of 2002, at least 3 fin whales have suffered serious injury or death due to entanglement. The fin whale (*Balaenoptera physalus*), whose distribution is poorly understood, ranges in the U.S. south from Nova Scotia to Cape Hatteras along the East Coast of the United States.[12] Up to 70 feet in length, fin whales are the second largest whale species in the world. Their distinction as the fastest swimming of all great whales is made possible by the sleek design of their long slender bodies. The slender, muscular design of their body means that they sink when not swimming and thus sink when dead (rather than floating as do the more blubber-rich bodies of right and humpback whales). Because of this, less is known about the causes or rates of their mortality. NOAA Fisheries acknowledges in the 2006 Stock Assessment Report that there is insufficient information to determine population trends or to quantify total levels of human-caused serious injury and mortality. However, NOAA Fisheries has set PBR for fin whales at 4.7 whales per year and estimates that only 1.8 whales suffer death or serious injury as a result of human action.[13]

17.    Although entanglement of whales can result in the animal's immediate death from drowning, frequently, animals die over a protracted period of time as they become debilitated by injuries or infections caused by the entanglement. In the case of

---

[11] 2006 Gulf of Maine Stock of Humpback Whales Stock Assessment at 18.
[12] 2006 Western North Atlantic Stock Fin Whale Stock Assessment at 25.
[13] <u>Id.</u> at 26.

North Atlantic right whales, of 17 right whales entangled since 1986 that did not manage to shed the entangling fishing gear, the average time until death was at least 10 months.[14] Gear often wraps the animal's flippers, mouths, and tail and, particularly in growing animals, often results in major tissue and bone damage and systemic infection. Further, once entangled, animals often lose weight, causing the carcass to sink the animal dies, causing under-reporting of entanglement-related deaths. Scientists consider fishing gear entanglement to be a major animal welfare issue for endangered whales.[15]

18.     In April and May of 2007, there have been large numbers of whales in Cape Cod and Massachusetts Bays, including right, humpback, and fin whales. Right whales and humpback whales can often be seen from shore, and I have seen them on many occasions. Commercial fishing vessels and the many buoys associated with fishing gear can also be readily viewed in the whales' vicinity. Having seen the results of entanglement in the past, I am acutely concerned about the fate of whales I see in the vicinity of gear. I have also been contacted by concerned citizens who have either seen whales from shore or from aboard whale watching vessels and are similarly concerned about the animals' safety as they are observed navigating among fishing-related buoys.

19.     The unique combination of my residence in coastal Massachusetts close to the habitat of the North Atlantic right, humpback, and fin whales and my personal and professional contacts have afforded me numerous opportunities to observe these

---

[14] Moore, M, S. Landry, B. Bowman, A. Knowlton, P. Hamilton, D. Rotstein. 2007. Morbidity and Mortality of Chronically Entangled North Atlantic Right Whales: A Major Welfare Issue. Proceedings of the 16th Biennial Conference of the Society for Marine Mammalogy, p.197.
[15] Id.

fascinating, endangered creatures. I will continue to take advantage of opportunities to view these animals as well as to assist in the conservation of the species.

20.    However, NOAA Fisheries' failure to provide protections to reduce entanglement of North Atlantic right whales, humpback whales, and fin whales in commercial fishing gear injures my ability to observe and study the species. In particular, NOAA Fisheries' failure to amend the Atlantic Large Whale Take Reduction Plan harms my interests because it indefinitely delays the imposition of critically important measures to reduce the risks of endangered right, humpback, and fin whales from being killed or injured from entanglement in fishing gear and increases the likelihood of my having to see additional entangled, injured, or dead whales. Consequently, NOAA Fisheries' actions deprive me of aesthetic, recreational, and scientific benefits I derive from this species and my ability to observe these imperiled whales in their natural habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:  _05/21/07_

Sharon B. Young

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES; and THE OCEAN CONSERVANCY, ) ) ) ) | Civ. No. 07-0333 (ESH) |
| Plaintiffs, ) ) | |
| v. ) ) | |
| CARLOS M. GUTIERREZ, et al., ) ) | |
| Defendants. ) ) | |

DECLARATION OF JOHN PHILLIPS

I, John Phillips, declare the following:

1.    I am a member of The Ocean Conservancy and reside in Portland, Maine, and Boston, Massachusetts. I am also the New England Regional Director for The Ocean Conservancy and am based in The Ocean Conservancy's New England Office in Portland, Maine. I have held this position with The Ocean Conservancy for 6 years.

2.    My experience growing up on the coast of New England instilled in me a strong love of the ocean and its living resources. I keep a sailboat in Harpswell, Maine, and regularly use it in the surrounding waters and all the way down to Cape Cod. The loss of marine life and destruction of the ocean ecosystem diminishes my enjoyment of cruising the coast of New England.

3.    My interest in ocean protection is also influenced by my scientific background and professional experience. I hold a Bachelor's Degree in American history from Harvard University and a Master of Science Degree in Natural Resources from the University of Michigan's School of Natural Resources. Before coming to work for The Ocean Conservancy, I worked for three Governors of Massachusetts, the National Oceanic and Atmospheric Administration, and several non-profit organizations. I was the U.S. Executive Director for the Atlantic Salmon Federation in the coastal town of Ipswich, Massachusetts, trying to restore salmon populations severely depleted by overfishing and habitat destruction. I also worked as a consultant to the Conservation Law Foundation on fish conservation issues, including working to ameliorate the damaging effects of salmon aquaculture.

4.     From 1991 until 1999, I served as the Commissioner of Fisheries, Wildlife, and Environmental Law Enforcement for the State of Massachusetts. In that capacity, I oversaw a variety of work to protect North Atlantic right whales, humpback whales and fin whales, including the Massachusetts Division of Marine Fisheries' involvement in fishing gear changes and its participation on the Atlantic Large Whale Take Reduction Team, formed pursuant to the federal Marine Mammal Protection Act and facilitated by the National Marine Fisheries Service. During my tenure with the State of Massachusetts, we were aware of the growing problem of large whale entanglement in commercial fishing gear, in particular for North Atlantic right whales. Division of Marine Fisheries personnel and I had various discussions about new breakaway lobster gear and other techniques to reduce entanglement. We also considered these issues in meeting with the Secretary of Environmental affairs as well as at the state's Marine Fish Advisory Commission.

5.     I have seen right whales, humpback whales and fin whales in New England waters first hand and have a strong interest in being able to continue to see them as part of my enjoyment of the New England coast and Atlantic Ocean. The failure of the federal defendants to protect and recover these species – including their failure to take timely action to amend the Atlantic Large Whale Take Reduction Plan – directly affects my aesthetic, recreational, and scientific interests.

6.     The Ocean Conservancy, founded in 1972, is a non-profit science-based environmental advocacy organization with headquarters in Washington, D.C., and offices in Maine, Florida, California, Texas, Washington, and the U.S. Virgin Islands. The Ocean Conservancy is the largest and oldest U.S. environmental organization solely dedicated to protecting ocean ecosystems and sustainable fisheries, including those resources off the Atlantic Coast. To further its goals, The Ocean Conservancy conducts research, promotes public awareness, education, and citizen involvement in the conservation of ocean wildlife, and advocates for conservation through litigation, lobbying federal, state, and local legislatures, and participating in administrative informal rulemakings through comments and at hearings.

7.     The Ocean Conservancy currently has approximately 139,368 members and donors nationwide, including over 53,700 members in East Coast states that border large whale habitat and migratory routes. The Ocean Conservancy regularly sends information to our members that is relevant to our mission via direct mailings, electronic mail, our website www.oceanconservancy.org, and our magazine – *Ocean Conservancy*. Ocean Conservancy staff members regularly publish special reports, stories, and articles in various media. These communication capabilities enable us to disseminate our advocacy messages on behalf of our members and educate and empower our members to communicate with their elected officials.

8.     Many of our members, like myself, belong to The Ocean Conservancy because they use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, research, and study. As a result of their activities, members of The Ocean Conservancy receive economic, social, aesthetic, recreational,

2

scientific, educational, and physical benefits from the Atlantic Ocean and its marine wildlife. Many of our members are especially concerned about protecting marine wildlife and accordingly maintain an active interest in the conservation of large whales, including right whales, humpback whales and fin whales, as some of the most endangered marine mammals in the world.

9. The Ocean Conservancy (formerly the Center for Marine Conservation) has actively worked to conserve Atlantic large whales since 1989. Our work has included serving as a member of the Atlantic Large Whale Take Reduction Team since its establishment in 1996 in an attempt to find solutions to the problem of right whale entanglement in commercial fisheries. We have also worked extensively to protect North Atlantic right whales in particular, including petitioning and subsequently suing the National Marine Fisheries Service and Coast Guard for the agencies' failure to protect the species from ship strikes, as well as submitting numerous comment letters and testifying at public hearings on this matter. In 2002, we also petitioned the National Marine Fisheries Service to revise the right whale's critical habitat designation to improve protections for the species.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May  15  , 2007, in Portland, Maine.

John Phillips
New England Regional Director
The Ocean Conservancy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
THE HUMANE SOCIETY OF THE          )
UNITED STATES                                 )      Civ. No. 07-0333 (ESH)
and THE OCEAN CONSERVANCY,       )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                             )
                                                    )
CARLOS M. GUTIERREZ, et. al.,          )
                                                    )
            Defendants.                          )
_____)

**[PROPOSED] ORDER**

        Upon consideration of Plaintiffs' Motion for Summary Judgment, it is hereby ORDERED

that Plaintiffs' motion is GRANTED. It is further ORDERED that Defendants shall issue a final

amended Atlantic Large Whale Take Reduction Plan and implementing regulations within 30

days from the date of the issuance of this opinion.


Dated: _____              _____
                                                        Hon. Ellen S. Huvelle
                                                        United States District Judge